David Howard KEISER, Jr., d.b.a. Keiser Manufacturing Co., Plaintiff,

v.

J. WISS & SONS CO., a New Jersey corporation, Defendant.

Civ. A. No. 1225–66.

United States District Court,
D. New Jersey.

March 29, 1972.

Lafferty, Rowe, McMahon & McKeon by William Rowe, Newark, N. J., for plaintiff; William J. Ruano, Pittsburgh, Pa., of counsel.

Hodes & Hodes, Newark, N. J., for defendants; Sparrow & Sparrow by Maxwell E. Sparrow and Mark H. Sparrow, New York City, of counsel.

## OPINION

AUGELLI, Chief Judge:

This is an action for infringement of claims 3 and 5 of United States Letters Patent No. 2,661,534 (hereinafter '534) issued to plaintiff, David Howard Keiser, Jr., on December 8, 1953, for an invention relating to "shearing devices of all types."

Plaintiff, a resident of Pennsylvania, and doing business as Keiser Manufacturing Co., is the owner of the '534 patent and has been such owner since the date of its issuance.

Defendant, J. Wiss & Sons Co., is a New Jersey corporation, having its principal place of business in Newark, New Jersey, where it has made and sold shears that are alleged to infringe claims 3 and 5 of plaintiff's patent.

The action was tried to the Court on the issues of validity, infringement, file wrapper estoppel and laches, as raised in the complaint, answer and counterclaim. Plaintiff seeks damages, including profits for infringement, and a trebling of said damages because of the alleged wilful character of the infringement, plus costs and a counsel fee. In its counterclaim, defendant seek a declaration that the '534 patent is invalid, and that the accused devices made and sold by it do not infringe claims 3 and 5 of said patent. The Court has jurisdiction over the parties and subject matter of the action under 28 U.S.C.A. § 1338(a), and as to the relief sought by the counterclaim, jurisdiction is invoked under 28 U.S.C.A. § 2201.

The invention of the '534 patent in suit relates to shearing devices of all types, such as tinsmith, pruning, hedge trimming and grass clipper shears. As stated by plaintiff in the specifications, the invention "may be embodied in any device having a shearing, cutting, clipping, or scissors action, in which two cutting blades are operated relative to each other so that their cutting edges cross each other." The patent further recites that:

"In such devices the blade which is positively moved toward the other is the one which, according to my invention, automatically cants toward the other blade as soon as its shearing, cutting or clipping movement begins. For this purpose, the movable blade is loosely mounted or journaled, to permit the operating or driving member to cant, or tilt, the blade in cutting direction. The driving or operating member, in turn, is so formed and connected to the movable blade that actuation thereof will immediately cause the blade to cant or tilt as it is moved thereby to assure positive shearing action at all times. In this manner, positive canting action takes place throughout shearing the entire movement."

And finally it is stated that:

"Ordinarily, the blades of the similar devices of the prior art, must be accurately set relative to each other and firmly held together at their pivotal connection in order to provide efficient shearing contact between their

cutting edges. This is not required with the device of my invention because the shearing contact is secured by a cant of one of the blades relative to the other, as effected by its movement producing member. Furthermore, the tendency is to further cant the blade as soon as the object, or material to be cut, is engaged by the cutting edge of the blades during operation of my novel shearing device. This causes the movement producing member to increase the cant or tilt of the blade until the shearing function is completed and thereby increase the contact pressure between the cutting edges of the blades in direct proportion to the power exerted in performing the shearing operation by hand, or otherwise."

The patent in suit, Exhibit P–1 in evidence, describes a number of shearing action devices which embody plaintiff's invention. This case, however, is concerned only with shears of the character described in, and illustrated by, Figs. 10 to 16, inclusive, of the patent. Said figures show a manually operated shearing device, such as is used for cutting or trimming grass, twigs, and the like. The shears marked in evidence as Exhibit P–3, is said by plaintiff to be representative of the shears that are made and sold by him under claims 3 and 5 of his patent. A breakdown of the elements comprising these claims will be stated later in this opinion.

The shears which are alleged to infringe claims 3 and 5 of the patent in suit have been marked in evidence as Exhibits P–7 and P–8. Admittedly, said shears were made and sold by defendant subsequent to the issuance of the '534 patent, and with full knowledge of the existence of said patent. The P–7 shears were made and sold between the years 1962 and 1965, and are illustrated on page 2 of defendant's catalogue marked in evidence as Exhibit P–10. Some time between 1962 and 1965, a modification was made in the cross-bar of the P–7 shears, which modification is embodied in the P–8 shears. These shears were made and sold from 1965 to the date of the institution of suit, and they are illustrated on page 2 of defendant's catalogue marked in evidence as Exhibit P–11.[1]

It has been stipulated that defendant sells more P–7 and P–8 shears than any other grass shears in the same price range, and also that the P–8 shears is one of defendant's most popular numbers. A further stipulation shows the increasing yearly sales of defendant's shears and the net selling price thereof to wholesalers. Records of defendant, not made available at this stage of the proceedings, would disclose the profit made on sales of the accused shears.

It is defendant's position that claims 3 and 5 of the patent in suit are invalid because they fail to satisfy the conditions for patentability with respect to novelty and non-obvious subject matter. Affirmatively, it is defendant's position that its shears, P–7 and P–8, do not come within the scope of claims 3 and 5, and thus do not infringe the same; that plaintiff is precluded by the doctrine of file wrapper estoppel from asserting infringement; and, finally, that plaintiff is guilty of laches.

Plaintiff's shears, P–3, are sold under the federally registered trademark "Push-Cut", and are individually packaged and marketed in boxes such as the one marked Exhibit P–6 in evidence. Defendant contends that plaintiff's shears, as exemplified by P–3, are not made in accordance with claims 3 and 5 of the patent in suit. In support of this contention, defendant has made up and offered in evidence, as Exhibit D–22,

---

1. The model of the P–7 shears in evidence is representative of the shears shown and described in Kuchta patent No. 3,064,351, marked in evidence as Exhibit P–12. The model of the P–8 shears in evidence is representative of the shears shown and described in Wertepny patent No. 3,064,350, marked in evidence as Exhibit P–9. Defendant is the owner, by assignment, of the Kuchta and Wertepny patents.

a shears which it alleges is truly representative of the claims in issue of the '534 patent. Assuming this to be so, defendant would not be aided thereby if the accused devices, in fact, infringe valid claims.

Initially, plaintiff relies upon the statutory presumption of validity accorded to patents by 35 U.S.C.A. § 282. He argues that defendant has not overcome the heavy burden imposed by law on the party asserting invalidity. Schmidinger v. Welsh, 383 F.2d 455 (3 Cir. 1967). Defendant, conceding the presumed statutory validity of patents issued by the Patent Office, points out that such presumption is by no means conclusive and is weakened by the failure of the Patent Office to consider pertinent prior art. Atlas Copco Aktiebolag v. Ingersoll-Rand Company, 279 F.Supp. 783 (D.N.J.1967).

At this point it should be noted that among the prior art patents relied upon by defendant in this case is one issued to plaintiff on May 5, 1942, for an invention relating to a "pivotal connection for shears." This patent, No. 2,281,977 (hereinafter Keiser '977), has been marked in evidence as Exhibit P–15. Figs. 1 to 6, inclusive, of said patent illustrate a clipper grass shears, a model of which has been marked in evidence as Exhibit P–5. The other prior art patents relied upon to negative patentability are:

Roome, No. 21,369 (hereinafter Roome '369), issued August 31, 1858;

Weston, No. 361,911 (hereinafter Weston '911), issued April 26, 1887;

Breach, No. 1,135,989 (hereinafter Breach '989), issued April 20, 1915; and

Huberty, No. 1,632,479 (hereinafter Huberty '479), issued June 14, 1927.

All of these patents are included in the group marked in evidence as Exhibits D–1 through D–12. Roome '369 is D–1, Weston '911 is D–5, Breach '989 is D–6, and Huberty '479 is D–9. Of the five prior art patents relied upon by defendant in this case, Weston, Breach and Huberty were not cited by the Patent Office during prosecution of the several applications which resulted in the issuance of the '534 patent in suit.

As to the scope and content of the prior art plaintiff, who was in the business of manufacturing shears for over 50 years, testified concerning the art of shear-making prior to the time his '977 patent was issued on May 5, 1942. In essence, he said that all shears then manufactured were "hard working" since the blades pivoted substantially in the same plane about a pivot bolt that held them closely together flatwise. To improve the cut of such shears, the prior art thought that the cutting characteristics of the blades could be improved by merely tightening up on the pivot bolt so as to bring the blades closer together. Plaintiff said that while such tightening might increase the cutting characteristics of the blades, it also created a lot of friction and resulted in a more difficult and fatiguing operation.

Plaintiff points to the prior art patents as proof of the fact that for over the past 120 years, there was a pressing need for a pair of shears that could be economically mass produced, function with a very easy working action, and yet automatically tighten up and cut heavy clumps of grass or large twigs without separation of the blades, all in response to a squeezing action exerted by the operator upon the handles. The P–3 shears covered by the patent in suit, is claimed to be the first to meet this demand by having a "push-cut" action brought about by a lever spaced above a movable blade so as to provide a moment arm that will give power amplification and better cutting action; and, also, that by reason of its location and loose connection with other elements that go to make up the shears, the lever "pushes" the rear edge portion of the movable blade and laterally tilts or cants it tightly against the stationary blade only during the cutting operation.

In claim 3 of the patent in suit there are six elements in shears of the char-

acter described in the '534 patent, comprising:

(a) an integral handle and blade unit;

(b) a pivot stud intermediate the ends of said unit;

(c) lever means pivoted on said pivot stud above the blade of said unit;

(d) a cutting blade loosely pivoted on said pivot stud between said handle and blade unit and said lever means;

(e) a connecting stud projecting from said cutting blade and loosely engaging said lever means in spaced relation to said cutting blade to establish a rocking connection on said pivot stud of said loosely pivoted blade by said lever means; and

(f) a second handle for operating said lever means.

In claim 5 there are five elements in shears of the character described in the '534 patent, comprising:

(a) an integral handle and cutting blade unit;

(b) a pivot stud intermediate the ends of said unit;

(c) a second handle pivotally mounted on said unit;

(d) a second cutting blade loosely pivoted on said pivot stud; and

(e) means establishing a loose connection between said second handle and second cutting blade above the cutting edge of the latter and adjacent the rear edge of said second cutting blade so that the second cutting blade will be pushed about the pivot stud in tilted relation to the blade of said unit during the cutting operation of the shears.

Exhibit P–2 in evidence recites the language of claim 5 of the patent in suit, and illustrates in color, on an enlarged scale, the elements comprising plaintiff's P–3 shears. These are the same as Figs. 10 to 16, inclusive, of the patent. The heart of the invention is said to revolve around Fig. 13 on P–2. This has been variously called a lever, a cross-arm, and a movement transmitting plate. Briefly stated, it is the placement of this lever (34) to the rear edge por-

tion of the movable blade (30) instead of the front edge portion thereof, and the location of said lever above, and in spaced relation to the movable blade, coupled with the lever's loose connection with stud (37) and loose pivoting on stud (31), that is said to give plaintiff's shears the so-called "push-cut" action and the tilting or canting of the movable blade which results in a more positive contacting of the cutting edge surfaces of the blades. It is claimed that none of the prior art patents, including plaintiff's own '977, meet the terms of either claim 3 or claim 5 of the patent in suit, since they do not, in their respective devices, include a lever spaced above a movable blade and loosely connected to the rear edge portion thereof so as to bring about a direct lifting of the rear edge portion of the movable blade, with a resultant lateral tilting or canting of the movable blade during the cutting operation of the shears. In particular, it was pointed out that while the shears of the '977 patent, P–5, may, like the P–3 shears of the patent in suit, have a tiltable movable blade, it lacks the "push-cut" feature of the P–3 shears. It was claimed that in the P–5 shears, the operator had to "pull" the movable blade rearwardly, thereby tending to increase the likelihood of a separation of the blades, with a consequent impairment of the efficiency of the cutting action. Thus it is said that in the '534 patent the movable blade is "pushed" forward, and that in the Keiser '977 patent the movable blade is "pulled" rearward.

The patent in suit is a combination patent involving a mechanical device comprising a number of elements. Some of these elements, such as the cross-bar or lever mentioned earlier in this opinion, are said by plaintiff to be new elements which, in combination and cooperation with old elements, achieve unexpectedly useful cutting functions not attained by the mere sum of the parts, such that the whole exceeds the sum of the parts. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950),

courts are admonished to "scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." The same case also holds that "[t]he conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." The contention of the defendant, simply stated, is that no new elements are involved in the shears produced under claims 3 and 5 of the patent in suit; that all of the elements recited in said claims may be found in the prior art patents; and that the claims define no more than a combination of old and well known shear elements wherein each element serves no new, additional or different function in the combination than it served separately.

Patentability is dependent upon the utility, novelty, and non-obviousness of the subject matter sought to be patented. 35 U.S.C.A. §§ 101, 102 and 103.

In support of its claim of lack of novelty under Section 102 defendant asserts that the five prior art patents cited by it are all applicable on this issue, in that the applications which resulted in the issuance of said prior art patents were all filed in the United States before the date of plaintiff's invention. Since the proofs offered with respect to lack of novelty also embraced the issue of non-obviousness under Section 103, and indeed, since such proofs were directed primarily to the requirements of Section 103, a determination made with respect to that Section will be dispositive of the issue of validity of the claims in issue. Section 103 reads as follows:

"a patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differ-

ences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

As was stated by Mr. Justice Clark in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), Section 103 was intended merely as a codification of judicial precedents embracing the condition laid down in Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 261, 13 L.Ed. 683 (1851) [2], with congressional directions that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability. Graham teaches that:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

A careful consideration and study of the prior art patents, particularly Keiser '977, in light of the evidence adduced at the trial, leads to the conclusion that claims 3 and 5 of the patent in suit are invalid for failure to meet the test of patentability laid down in 35 U.S.C.A.

2. The Hotchkiss formulation was stated as follows:
"[U]nless more ingenuity and skill * * were required * * * than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skillful mechanic, not that of the inventor." 11 How. at 281, 52 U.S. at 281, 13 L.Ed. 683.

§ 103. Essentially, the language of claims 3 and 5 requires a loosely pivoted movable blade, and lever means establishing a loose connection between the second handle of the device and the movable blade, to the end that the movable blade will be pushed about the pivot stud in tilted relation to the stationary blade of the unit during the cutting operation.

All of the prior art patents disclose shearing devices comprising an integral handle and (stationary) blade unit, with a pivot stud intermediate the ends of said unit, and a second handle (which actuates a movable second cutting blade) pivotally mounted on said unit. In all prior art patents the movable blade is pivoted on a pivot stud with lever means of one kind or another to establish a connection between the second handle and the movable blade.

In the main, plaintiff's expert, William P. Cole, sought to distinguish claim 3 from the prior art patents by pointing out that the cutting or movable blade in Roome '369 is not loosely pivoted on its pivot stud in the sense required of a shears of the character described, i. e., shears in which the blade can rock on a longitudinal axis, and also that the stud in Roome does not engage lever means in spaced relation to the movable blade to establish a rocking connection on the pivot stud of the movable blade by said lever means, which arrangement would result in canting the movable blade toward the stationary blade during the cutting operation. For substantially the same reasons, Cole distinguished claim 3 from Huberty '479. The Court is satisfied that none of the prior art patents, other than Keiser '977, disclose any loosely pivoted arrangement of the movable blade and lever means that results in canting of said blade during the cutting operation.

On the assumption that neither Breach '989 nor Keiser '977, standing alone, disclosed all of the elements of claim 3, defendant has combined them to show that together said prior art patents do contain all of the elements of claim 3. Defendant's expert, Max Fogiel, testified that the connecting stud 15 in Breach is the only element of Breach which need be applied to Keiser '977 in order to meet all of the structure of the '534 patent, and that said stud 15 is used by Breach for tilting the movable blade, as is stud 37 in the patent in suit. Fogiel further testified that the lever means recited in claim 3 reads on member 7 of Keiser '977, and that said member 7, referred to as a ride in the art of shearmaking, is structured as a lever and also functions as such. Cole sought to distinguish the combination of the two patents by saying that neither patent discloses lever means pivoted on the main pivot stud; that element 7 of Keiser '977 is not a lever; that since there is no lever in either patent, the movable blades of their respective devices cannot be between the handle and blade unit and (nonexistent) lever; and since there is no lever, there can be nothing engaging it in spaced relation to the loosely pivoted blade in Keiser '977 (there being no loosely pivoted blade in Breach according to Cole). This expert's disagreement with Fogiel's testimony centers primarily on the latter's characterization of member 7 of Keiser '977 as a lever and the reading of the lever means of claim 3 on that member. A lever, as defined in Webster's New International Dictionary, Second Edition, is a

"rigid piece which is capable of turning about one point, or axis (the fulcrum), and in which are two or more other points where forces are applied— used for transmitting and modifying force and motion."

The Court is satisfied that member 7 of Keiser '977 is a lever and that it functions as such, and also that the connecting stud 15 in Breach suggests the use for which stud 37 is used in the patent in suit.

In connection with the consideration of Breach '989 in conjunction with Keiser '977, plaintiff contends that since neither patent discloses his inventive concept or his specific combination for providing "push-cut" action (which will be considered later), it was improper for

defendant to combine said patents. This would be true if, in fact, neither patent made any pertinent disclosures. However, on the issue of obviousness, it is not necessary that all elements of a claimed invention be found in any one prior art patent. It is permissible to combine the elements found in several prior art patents. Sperti Products, Inc., v. Coca Cola Co., 399 F.2d 607 (3 Cir. 1968); Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912 (3 Cir. 1966).

With respect to claim 5 of the patent in suit, Cole sought to distinguish said claim from Roome '369, again, because the cutting movable blade in Roome is not loosely pivoted on its pivot stud in the manner required in shears of the character described, i. e., shears in which the blade is free for rocking or tilting around the longitudinal axis thereof, and also because said blade cannot be "pushed" about the pivot stud in tilted relation to the stationary blade of the unit during cutting operation of the shears. These same reasons are advanced to distinguish claim 5 from Weston '911, Huberty '497 and Breach '989, except that with respect to Huberty and Breach it is claimed that the movable cutting blade is "pulled" and not "pushed" about the pivot stud, and is not "pushed" in tilting relation to the cutting blade. Additionally, it is said that the pivot stud in Breach is not intermediate the ends of the handle and blade unit of that device.

As to Keiser '977, Cole attempts to distinguish claim 5 from that patent by pointing out that no element of the Keiser '977 connecting means is "adjacent" the rear edge of the movable cutting blade, and also that the portion of said connecting means which is connected to the blade is in tension and therefore "pulls" and does not "push" said blade about the pivot stud. The word "adjacent" is defined in Webster's New International Dictionary, Second Edition, as

"Lying near, close, or contiguous; neighboring; bordering on * * *. Objects are ADJACENT when they be

close to each other, but not necessarily in actual contact; * * *."

The loose connection established by means 7, 9, 10 in Keiser '977 does, however, seem to be "adjacent" the rear edge of the second cutting blade, as that term is commonly understood and defined in Webster.

With respect to the "pull" versus "push" argument, it is plaintiff's contention that in none of the prior art patents is there any indication that the second or movable cutting blade of the several devices covered thereby "will be pushed about the pivot stud in tilted relation to the blade of said unit during cutting operation of the shears." Referring particularly to Roome, Breach, and Keiser '977, Cole testified that the second or movable cutting blades of their respective devices all "pull" about the pivot stud, and do not 'push' said blade about the pivot stud as is done by the '534 patent device. It is this "push-cut" action that plaintiff terms "revolutionary" and allegedly constitutes the "novel and inventive concept" of his '534 shears.

There was testimony by defendant's expert Fogiel that the terms "pushed" or "push-cut" have no application to a physical analysis of the force applied to close the movable blade. Whether the movement on a plane with concomitant canting occurs by a "push" from the direction of the rear edge of the blade toward the stationary blade and slightly downward, or by a "pull" from the direction of the cutting edge and also slightly downward, the result is exactly the same. An analysis of those two forces, according to Fogiel, would demonstrate that the pushing or pulling of the blades together would be caused by the same degree of force applied at the same angle but in opposite directions. In other words, if the force in the '534 device "pushes" the movable blade toward the stationary blade, then the force used in the Keiser '977 device to accomplish the same result is likewise a "pushing" force.

In the opinion of the Court, the distinction sought to be made by plaintiff between a "pushing" force or a "pulling"

force to close the movable blade is of little significance. The canting action can be achieved by either force, and in terms of force analysis, the direction of application of a pulling force or a pushing force is irrelevant if their resultant angle to the plane of the blade and force is the same. The application of force, whether it be a pushing force or a pulling force, to cause a canting of the movable blade in relation to the stationary blade, was taught by Keiser '977.

It is apparent that Keiser '977 is the most pertinent of the prior art patents. It relates to a "pivotal connection for shears." The invention is said to be "more particularly applicable to the type of shears commonly known as clipper grass shears, in which one cutting blade is fixed and the other blade movable * * *." As stated by the patentee in the specifications:

"My invention relates to a new and improved pivotal connection of blades of the nature shown at 1 and 6 in the drawing. Heretofore such pivotal connection has commonly consisted of a screw, or bolt and nut, exerting a clamping-together stress of the blades to securely retain them in operative position throughout the progressive contact of the blade edges. Such clamping stress is constant during both opening and closing movements of the blades, causing friction, wear, and a tendency to clogging of the shears by uncut material caught between the blades.

"It is the object of my invention to overcome the above stated faults which reduces the efficiency of the shears and increase the force necessary to operate them * * *."

The two claims of Keiser '977 are significant in that they disclose a "non-binding" pivotal connection for the fixed and movable blades of the device, a pivot post on the fixed blade, a pivot ear for the movable blade spaced above the horizontal plane of said blade, a "relatively loose" unclamped fit on the pivot post, and an operating arm for the movable blade, all of which are so arranged as to tilt or cant the cutting edge of the movable blade toward the cutting edge of the stationary blade during the closing movement of the blades.

The level of ordinary skill in the art of shear-making is reflected in the many patents that have been issued for shearing devices, extending back for more than 100 years. The subject matter of the patent in suit being a mechanical device, the level of ordinary skill required in such cases is that indicated by Mr. Justice Clark in Graham v. John Deere Co., 383 U.S. 1, at 19–26, 86 S.Ct. 684, 15 L.Ed.2d 545, and by Mr. Justice Jackson in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. A person having ordinary skill in the art of shear-making would be able to visualize different known means of making connections, and to change rigid connections to loose ones, and to replace bolts or rivets with studs in forming pivotal connections. Once canting or tilting of the movable blade in shearing operations was made known, as disclosed by Keiser '977, methods of increasing the cant or tilt of the blade by the use of loose connections would seem obvious to a mechanic with ordinary skill in the art. The use of levers in the prior art patents to push movable blades, could also be applied to the prior art canting of the movable blade taught by Keiser '977. The addition of a lever and placement thereof above the blade, or attaching it to the rear of the blade, or even adding another loose connection, would not transcend the obvious applications of variations of known prior art to the canting of the blade. The invention of a canting shears disclosed by Keiser '977, represented a true advancement in the art. Such canting was achieved by means of a loose pivot for the movable blade and by transmission of the closing force over linkage with two loose connections. The device of the patent in suit is said by plaintiff to achieve better canting, with an avoidance of clogging, by the use of a third loose connection in the linkage located at the end of the lever means and above the

blade. That the device of the '534 patent works as claimed, is cheaper to produce than the Keiser '977 device, and has been widely adopted and successfully used, appears to be undisputed. But the fact remains that the '534 device does nothing more than the '977 device and other shearing devices of the prior art, even though, admittedly, in a more efficient manner. What plaintiff has done is to combine elements, all of which are old in the field of mechanics, and arrange them in such manner as to produce a better grass shears. The "new" element stressed by plaintiff and said by him to be the "heart" of his invention, is the lever or cross-arm shown as Fig. 13 in P–2, and the placement of that lever above the movable blade 30 in spaced relation to achieve the so-called "push-cut" action of the device. This improvement conceived by plaintiff, in the opinion of the Court, required nothing more than mechanical skill.

The Court has considered the commercial success enjoyed both by plaintiff's shears and the alleged infringing shears of defendant. There can be no question that plaintiff's and defendant's shears were commercially successful. But commercial success, absent invention, does not make for patentability. There is no proof in this case that plaintiff's '534 shears filled a long felt but unsolved need. There was no proof of futile attempts made by others to produce comparable shears, or the existence of any recognized problem that baffled the contemporary art. Plaintiff's testimony concerning the less complex, and therefore less expensive, method of assembly of the '534 device; the use of a loose blade connection that does not require time-consuming tapping on a drill press, as was required by Keiser '977; and the use of a stamped rather than drilled means of connecting the movable blade to the pivot stud, has been considered, but it all adds up to improvement and not patentable invention.

■ For all of the foregoing reasons, the Court finds that claims 3 and 5 of the patent in suit are invalid for failure to meet the test of non-obvious subject matter under 35 U.S.C.A. § 103.

However, should it ultimately be determined that claims 3 and 5 of the patent in suit are valid, defendant is clearly guilty of infringement. A mere visual examination and comparison of P–3, the device of the patent in suit, with the accused devices, P–7, representative of the shears under Kuchta '351, and P–8, representative of the shears under Wertepny '350, will show an almost complete identity in structure and operation.

■ It is settled law that the claims of a patent mark the extent of the monopoly granted thereby, and that in determining whether an accused device infringes a valid patent, resort must be had in the first instance to the words of the claim. If the accused device falls clearly within the claim, infringement is made out. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). But, as this case points out,

"* * * courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention * * may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system."

It was to avoid this "piracy" of inventions that led to the evolvement of the doctrine of equivalents. In Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945), the Court expressed the rule of equivalents as follows:

"It is elemental that the mere substitution of equivalents which do substantially the same thing in the same way, even though better results may be produced, is not such an invention as will sustain a patent."

As stated in Graver Tank & Mfg. Co. v. Linde Air Products Co., supra, what constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. A finding of equivalence is a determination of fact, and like any other fact issue, final determination requires a balancing of credibility, persuasiveness and weight of evidence. The Court is satisfied that the accused devices in this case, P–7 and P–8, perform substantially the same function in substantially the same way to obtain the same result as P–3, the shears of the patent in suit.

On the infringement issue, the area of disagreement between the experts was considerably narrowed and brought into sharp focus at the trial of the case.

With respect to the earlier model of the accused shears, P–7, in relation to claim 3 of the patent in suit, defendant's expert Fogiel testified that there was no infringement because that element of claim 3 providing for a connecting stud projecting from the movable cutting blade and loosely engaging the lever means, did not read on the structure of P–7. The reasons advanced for this conclusion were that the pin or stud in P–7 projects from the ride in back of the movable blade, is not in physical contact therewith, and does not project therefrom; and also because, in P–7, the pin or stud is tightly fixed and secured to the cross-arm or lever means, and hence does not engage the cross-arm loosely.

It thus appears that claim 3 is readable on P–7 in all respects except for the location of the pin or stud in that device, and the fact that the pin or stud in P–7 does not engage the cross-arm loosely. In P–7, the pin or stud projects from a ride in back of the movable blade. In P–3 it projects from the blade. In P–7, the pin or stud does not engage the lever means or cross-arm loosely. In P–3 it does. These variations, according to plaintiff's expert Cole, do not avoid infringement for the following reasons:

The blade in P–3 must be considered as including the ride. This would seem to be so from the terminology used in the patent in suit. Thus considered, claim 3 would be readable on P–7 insofar as the location of the pin or stud which projects from the blade or blade assembly is concerned.

As to the manner in which the pin or stud engages the lever means or cross-arm, it appears that in P–3 the fixed connection with the lever means or cross-arm is made at the bottom end of the pin or stud and the loose connection at the top end of the pin or stud. In P–7, the fixed connection with the lever means or cross-arm is made at the top end of the pin or stud, and the loose connection at the bottom thereof. Thus, there is an avoidance of the literal language of claim 3. Cole testified, however, and such appears to be the fact, that what is involved here is a mere reversal of parts, an interchange of the function of looseness from the top to the bottom end of the pin or stud, which does not in any way affect the overall operation and result obtained by P–7, said device performing substantially the same, function in substantially the same way to obtain the same result as P–3. Such reversal of parts may not be utilized to avoid infringement. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L. Ed. 147 (1929); Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605,

70 S.Ct. 854, 94 L.Ed. 1097 (1950); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Going now to the later model of the accused shears, P–8, in relation to claim 3, Fogiel testified that two elements of this claim do not read on the structure of P–8. These elements are (a), that in the language of claim 3, the lever means or cross-arm of the device recited in said claim is pivoted above the blade of the device, whereas in P–8, the lever means or cross-arm is pivoted both above and below the blade; and (b), that while claim 3 refers to a connecting stud projecting from the movable blade which loosely engages the lever means or cross-arm, in the accused device, P–8, there is no connecting stud loosely engaging the lever means or cross-arm.

As to element (a), Cole testified that if a claim calls for something which is pivoted above, said claim will read on that something which is pivoted above, regardless of whether that same something is pivoted somewhere else or not. Thus, in Cole's opinion, the fact that the lever means or cross-arm in P–8 is pivoted above the blade meets the language of claim 3, notwithstanding that part thereof is also below the blade. A visual comparison of plaintiff's P–3 shears with the accused device P–8, satisfies the Court that the pivoting of the lever means or cross-arm of P–8 above and below the blade does not take it out of claim 3. At best, what is involved here appears to be no more than an "exceedingly small and quite non-technical mechanical difference * * *." Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

With respect to element (b), it is true that P–8 has no connecting stud loosely engaging the lever means or cross-arm of that device, but the function of the stud is performed by a downwardly bent leg of the cross-arm which engages the movable blade. Thus, while P–8 has no separate stud element, the function of the stud is performed by the bent leg. Again, the literal language of claim 3 is avoided, but it is clear that the downwardly bent leg of the cross-arm in P–8 is an obvious equivalent of the connecting stud in P–3. This does not avoid infringement. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097.

Consideration will now be given to the infringement of claim 5 of the patent in suit by the accused devices P–7 and P–8.

First, as to P–7 in relation to claim 5. Fogiel testified that two elements of this claim do not read on the structure of P–7, hence there is no infringement. The distinctions pointed out are (a), that in the language of claim 5, the means establishing a loose connection between the second (lower movable) handle of the device and the movable blade is above the cutting edge of said blade and adjacent the rear edge thereof, whereas in P–7, the "means establishing a loose connection" is both above and below the cutting edge of the movable blade; and (b), that the "loose connection" in P–7 is not adjacent the rear edge of the movable blade, but is entirely off and distant therefrom and is rearwardly of the blade toward the handle of the device.

As to element (a), that the connecting means of P–7, rather than being only above the cutting edge of the movable blade and adjacent the rear edge thereof, is also below said blade, it was Cole's opinion that, despite this difference, claim 5 reads on the structure of P–7. The mere fact, said Cole, that some of the linkage in P–7 is below the cutting edge of the movable blade does not mean that some of it is not above, as it clearly is in P–7. Therefore, continued Cole, the limitation "above" in claim 5 is met, and the existence of part of the linkage or connecting means "below" the cutting edge of the movable blade in P–7, does not take that device out of the scope of claim 5. This is another instance of avoiding the literal language of the claim. While the language of claim 5 recites that the elements comprising the connecting means be above the cutting edge

of the movable blade and adjacent to the rear edge thereof, the presence of an element partly below the blade, in its relation to the connecting means does not, in the opinion of the Court, avoid infringement. This is a technical mechanical difference that has no effect on the overall operation of P–7 as compared with plaintiff's P–3 shears. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162.

With respect to element (b), that the "loose connection" in P–7 is not adjacent the rear edge of the movable blade, Cole testified, and a visual inspection confirms, that the loose connection in P–7 is adjacent the rear edge of the movable blade of that device. In P–7, defendant has adopted a construction in which the ride to which the movable blade is attached is made longer and the blade itself shorter so that the point where the pin is attached, even though it is adjacent the rear edge of the movable blade, is not directly and physically attached to the cutting blade portion of the blade. As Cole pointed out, there is no claim language requiring that the loose connection be made to the cutting edge portion of the blade. In P–7, as in plaintiff's shears P–3, the blade is a composite blade, consisting of two pieces, a casting at the rear, containing a pivot, and a cutting edge portion of the blade. But the pivot in P–7 is still adjacent the rear edge of the combination made up of the casting and cutting edge of the blade. In both devices, P–7 and P–3, the loose connection is on the side of the blade away from the cutting edge. Regardless, then, of whether the movable blade in P–3 is limited to the cutting portion thereof, as contended by defendant, or to the combination of casting and blade, it can make no difference on the issue of infringement because the loose connection of P–7 is adjacent the rear edge portion of the movable blade of that device.

Essentially the same reasons advanced by defendant in support of its argument that P–7 did not infringe claim 5, were likewise urged in defense of noninfringement of claim 5 by defendant's later device, P–8.

The effect of the arrangement of the connecting means being above the cutting edge of the movable blade in plaintiff's P–3 shears, and being both above and below the cutting edge of the movable blade in the infringing devices, has already been covered.

As to the argument that the "loose connection" in P–8 is not adjacent the rear edge of the movable blade, but is "rearwardly" of the blade, Cole pointed out that the difference between P–7 and P–8 in this respect is the fact that P–7 has a long ride and short blade, while P–8 has a single element, all blade, and that the connection is made to the offset portion of the back or rearward edge of the P–8 blade.

The same reasons advanced by plaintiff to show infringement of claim 5 by P–7, apply as well to the infringement of said claim by P–8.

In sum, it is clear from a comparison of the accused devices P–7 and P–8 with plaintiff's shears P–3, and a consideration of the language of claims 3 and 5 of the patent in suit, that said claims have been infringed. In passing, it is to be noted that the device of the Keiser '977 patent, P–5, was in the public domain when defendant started to make the accused shears. Apparently, defendant found it more profitable to copy the device of the '534 patent, rather than the device of the Keiser '977 patent, which could have been copied without fear of a possible suit for infringement.

■ The defense of file wrapper estoppel asserted by defendant has no merit. The law is well settled that what an inventor gives up in order to obtain a patent cannot later be recaptured by an overly broad interpretation of the claim language or resort to the doctrine of equivalents. Exhibit Supply Co. v.

Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942); Schmidinger v. Welsh, 383 F.2d 455 (3 Cir. 1967).

The file wrapper in this case has been marked Exhibit D–14 in evidence. Defendant argues that the file wrapper limits claim 5 to a structure the "loose connection" of which is "adjacent" the rear edge of the movable blade; that this limitation is not found in P–7 or P–8 because in each of those devices the loose connection is off and distant from the movable blade and "rearwardly" of the blade toward the handle; that the Patent Office would not have allowed claim 5 unless it was amended so as not to read on a structure in which the loose connection is rearwardly of the movable blade toward the handle; and that what plaintiff is now attempting to do is to broaden claim 5 through interpretation to include a structure which the Patent Office specifically excluded from being within the scope of claim 5.

Reference will now be made to application claim 27, which emerged as claim 5 of the patent in suit.

Application claim 27 as originally filed and rejected by the Patent Examiner, read as follows:

"Shears of the character described comprising, an integral handle and cutting blade unit, a pivot stud intermediate the ends of said unit, a second handle pivotally mounted on said unit, a second cutting blade loosely pivoted on said pivot stud, and means establishing a loose connection between said second handle and second cutting blade rearwardly of and above the cutting edge of the latter so that the second cutting blade will be pushed about the pivot stud in tilted relation to the blade of said unit during cutting operation of the shears."

The Examiner, in his Final Action notice, ruled that application claim 27 could be allowed if the words "rearwardly of and" were cancelled from the claim and that there be substituted therefor the words "and adjacent the rear edge of said second cutting blade", the new lan-

guage to be inserted after the word "latter". Thus, as amended that portion of the claim would read:

"* * * and means establishing a loose connection between said second handle and second cutting blade above the cutting edge of the latter and adjacent the rear edge of said second cutting blade * * *."

█ It is the position of defendant that this change of language creates a file wrapper estoppel, thus precluding a charge of infringement. A careful reading of the file wrapper indicates that the Examiner was suggesting amendments that would, in his opinion, distinguish claim 5 from the structure of the device covered by the Keiser '977 patent. It also appears that the Examiner considered the expression "rearwardly of and above the cutting edge" of the movable blade, as being indefinite and susceptible of two possible interpretations rearwardly, in the direction of the handle, and rearwardly in the lateral direction of the blade. He therefore suggested use of a clearer expression, i.e., "adjacent the rear edge", which plaintiff adopted. The new language suggested by the Examiner, as well as that appearing in application claim 27, reads on P–7 and P–8. The substitution of the word "adjacent" the rear edge of the movable blade, for "rearwardly" of the blade toward the handle, could not create an estoppel because the word "adjacent" in the context used in the claim is broader than the term for which it was substituted. Moreover, there can be no estoppel because a mere visual inspection of P–7 and P–8 discloses that the "loose connections" of those devices are, in fact, "adjacent the rear edge" of the movable blade.

██ The defense of laches is likewise unavailing to defendant. It is well settled law that the mere passage of time does not constitute laches. The attorney who formerly represented plaintiff advised defendant's present counsel by a number of letters in 1962, that P–7, then being made by defendant, infringed the

patent in suit. Attempts at a settlement were not successful. In a letter dated October 15, 1962, plaintiff's attorney reiterated the charge of infringement, and in another effort to resolve the dispute, suggested that the matter be referred to an independent patent lawyer for arbitration and final decision. No response was made to this letter. By letter dated December 9, 1966, plaintiff's present counsel notified defendant that its later shears, P–8, also infringed the patent. The four year delay stressed by defendant applied only to the P–7 shears and not the P–8 shears, since the latter did not appear on the market until 1965. As soon as plaintiff learned about the P–8 shears, suit was commenced. The limited sales of the P–7 shears, as compared with the increased sales volume of the P–8 shears, might well have justified the delay in starting suit in this case. But it is clear that defendant was definitely warned, under threat of suit, to discontinue infringement, and that it deliberately ignored such warning. At no time did plaintiff change his position on the infringement issue, of which defendant was fully aware, and the case is devoid of any proof that defendant was prejudiced by plaintiff's failure to sue between the time settlement negotiations fell through and the complaint filed. Finally, it is noted that plaintiff brought his action well within the statutory limitation period of six years provided in 35 U.S.C.A. § 286.

Upon a consideration of the entire case, the Court finds:

1. That claims 3 and 5 of the patent in suit are invalid for obviousness of the subject matter sought to be patented. 35 U.S.C.A. § 103;

2. That, based on such invalidity, defendant's shears, P–7 and P–8, do not infringe claims 3 and 5 of the patent in suit; and

3. That, based on such invalidity, the complaint will be dismissed with prejudice.

In the event it is finally determined that the patent in suit is valid, the Court finds:

4. That defendant's shears P–7 and P–8, infringe claims 3 and 5 of the patent in suit;

5. That plaintiff is not barred by the doctrine of file wrapper estoppel from maintaining his action for infringement;

6. That plaintiff is not guilty of laches;

7. That defendant's counterclaim be dismissed with prejudice.

The award of damages, costs and counsel fees will be reserved pending a final determination of the validity of claims 3 and 5 of the patent in suit, and the issue of infringement.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Counsel for defendant shall submit an appropriate order on notice to counsel for plaintiff or bearing said counsel's consent as to form.