**MGA, INC., Plaintiff,**

v.

**CENTRI–SPRAY CORPORATION, Defendant.**

**Civ. No. 83–CV–2641–DT.**

United States District Court, E.D. Michigan, S.D.

Dec. 22, 1987.

John R. Benefiel, Birmingham, Mich., for plaintiff.

Joseph W. Farley, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, Chief Judge.

### OVERVIEW

Plaintiff MGA, Inc.'s ("MGA") patent infringement action against defendant Centri–Spray, Inc. ("Centri–Spray") is before the court following a trial of issues relevant to Centri–Spray's affirmative defense of laches and estoppel. MGA had claimed that two products of the defendant, its Rudlaff and Plumridge design mechanical accumulators[1], infringe its U.S. Patent No. 3,570,656 (" '656"). Centri–Spray moved for summary judgment on that basis, and the court found that the plaintiff's claim with regard to the Rudlaff based products was barred by laches and estoppel. The court found with regard to the claim against the Plumridge device that a material issue of fact was in dispute and that summary judgment was, accordingly, unwarranted. In particular, the court held that the defendant could not "tack" onto the laches period established with regard to the Rudlaff claim unless it was shown that the nature of the infringing activity was substantially similar in the Plumridge device.[2] Since it was unclear whether the nature of Centri–Spray's conduct had substantially changed, the court denied that part of defendant's motion for summary judgment.

■■■■ As the court previously noted, laches and estoppel are distinct concepts in patent law. Laches arises from an unreasonable delay by the patentee in enforcing its rights that has materially prejudiced the alleged infringer. *Watkins v. Northwestern Ohio Tractor Pullers*, 630 F.2d 1155 (6th Cir.1980). Material prejudice to the defendant is presumed if there is an unexcused six-year delay in filing suit. *Id.* at 1159. A finding of laches works to prevent the plaintiff from recovering any damages for infringement that occur prior to the filing of the suit. If estoppel is estab-

lished, the plaintiff may not obtain prospective relief. *Id.* at 1159–60. To show estoppel, the defendant must first establish laches and must additionally show that the patentee had made representations which indicated that it was abandoning the claim or which indicated that the defendant could "believe that its business would be unmolested." *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 350 (6th Cir.1979). A finding of estoppel, since it presupposes laches, effectively bars the patentee's entire claim for infringement. In this case, Centri–Spray has put forth no evidence which would independently establish laches and estoppel with respect to plaintiff's Plumridge based claims. Thus, to make out the affirmative defense with respect to this claim, it was required to show that the nature of its alleged infringing activity had not changed with the introduction of the Plumridge model conveyor. *Watkins, supra; Celotex Corp. v. Jacuzzi Whirlpool Bath, Inc.*, 211 U.S.P.Q. 232 (N.D.Ohio 1980); *Nordson Corp. v. Graco, Inc.*, 187 U.S.P.Q. 119 (N.D.Ohio 1975); *Keiser v. J. Wiss & Sons Co.*, 173 U.S.P.Q. 594, 340 F.Supp. 41 (1972). Two questions are raised: firstly, which aspect of the Rudlaff device plaintiff originally alleged to be infringing, and, secondly, whether this aspect changed in the Plumridge device.

The first question is made difficult by the fact that the communications between the parties in 1969–1970 found to establish the laches and estoppel defenses with regard to the Rudlaff-based claims were general allegations of infringement of the soon-to-be issued patent. Defendant's request that MGA's predecessor in interest specify the infringement claims went unanswered. The issue was developed somewhat in the course of communications between MGA and Centri–Spray in the late seventies. In his letter of October 2, 1978, MGA counsel indicated his belief that the Rudlaff device, in particular one configuration of it installed for the Pontiac division of General Motors, infringed specific claims

---

1. It should be noted that Centri–Spray has obtained patents on both its Rudlaff (U.S.Pat. No. 3,545,600) and Plumridge (U.S.Pat. No. 4,484,-676) products.

2. This court's earlier opinion is reported at 639 F.Supp. 1238.

of the '656 patent. After consulting Centri-Spray's designs, the list of allegedly infringed claims was revised. Laches and estoppel were not found with regard to these specific allegations; however, the court has held that the defendant could justifiably rely on the earlier generalized claims of infringement. When MGA instituted suit in 1983, the allegations of infringement were similarly unspecified. In the most recent pretrial order, MGA indicates that both devices infringe "at least" Claim 13 of the patent in suit. Almost by default, then, the laches and estoppel issue still left to be decided centers around Claim 13 [3] and the accumulation control feature of the device which it describes.

■ Since the plaintiff alleges that both devices infringe the same claim of the patent, the defendant takes the position that the nature of the alleged infringement is the same as a matter of law. While Centri-Spray acknowledges numerous physical differences between the devices, it argues that these may only alter the method of proof of the alleged infringement but not its nature. The defendant bases its argument on the structure of the patent law. The scope of a patent holder's monopoly right are defined and limited by the claims of the patent. *Aro Manufacturing Co. v. Convertible Top Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). Additionally, the plaintiff may only recover for infringement if it is able to show the presence of each element of the patent claim asserted to be infringed (or its substantial equivalent) in the suspect device. *Lemelson v. United States*, 752 F.2d 1538 (Fed.Cir.1985). Infringement is, as a matter of law, only determined with reference to particular claims of the patent. From this concise statement of the law, the defendant concludes that the infringement has not

changed unless the plaintiff shows that some other claim is infringed by the Plumridge device. Stripped to its bare bones, defendant's assertion is that since plaintiff contends that both Rudlaff and Plumridge, which is a modification of Rudlaff, infringe Claim 13, *ipso facto* any alleged Plumridge infringement is absolved by virtue of the Court's ruling that laches and estoppel preclude the advancement of plaintiff's infringement claim against Rudlaff.

While the defendant's theory offers a clear path through the thicket of the laches and estoppel issue raised in this case, the court declines to adopt it. The defendant has not cited any decision which embraces its position. The view is not espoused in the authority the court relied on for its prior decision that the defendant could only "tack" onto the laches clock established with regard to the Rudlaff design if the character of the allegedly infringing conduct was substantially similar in the Plumridge device. The equitable doctrines of laches and estoppel act solely to bar particular claims lodged by the plaintiff against particular conduct of the defendant. *Nordson, supra* at 120; *Celotex, supra,* at 232–233. The defendant's position would, in essence, provide it with *carte blanche* to infringe Claim 13 of the plaintiff's patent. Further, since laches and estoppel were found to result from generalized allegations of infringement, defendant's position would logically require that plaintiff's infringement action based on any claim of the patent in suit be similarly barred. Most importantly, however, the defendant's position misconstrues the nature of a claim of patent infringement.

In this regard the recent decision of the Federal Circuit in *Young Engineers, Inc. v. U.S. International Trade Commission,*

---

**3.** The 13th claim of the '656 patent, in relevant part, sets forth the accumulation control feature of MGA's device, noting broadly that the conveyor contains:

"control means responsive to the sensing of the absence of a workpiece at the delivery or any intermediate station to activate the feed means of every station in the rear of the empty station to simultaneously advance a workpiece to the next successive station, said

control means comprising a series of individually separately movable elements, all of said elements being movable relative to a support in the same sense, and abutment means acting between said elements effective to ensure identical movement of all elements located in one direction from a particular element upon movement of such particular element, while the elements located in the opposite direction are not moved."

721 F.2d 1305 (1983) should be noted. In *Young Engineers,* the Federal Circuit defined the scope of an infringement claim for purposes of the doctrine of claim preclusion. The patentee had previously brought suit alleging that the defendant's device infringed its patent. That suit was voluntarily dismissed with prejudice. Subsequently the patentee challenged the importation of defendant's products into the United States under 19 U.S.C. § 1337(a) on the grounds of unfair competition, viz., patent infringement. Though the relief offered by an administrative proceeding under § 1337 was not available in the prior infringement action, the court held that claim preclusion could operate to bar the plaintiff's cause. In particular, the court noted that "[i]f a patent owner has unsuccessfully attacked an alleged infringer for the same infringing acts in a prior court proceeding, no substantive argument has been advanced as to why the patent owner should be given an opportunity to put forth the same charge of infringement again." 721 F.2d at 1315.

In determining whether the patentee's claim was barred, the court was required to look to whether it was advancing the same claim of infringement. Here the court focused on the devices alleged to infringe the patent in the first action:

> With respect to patent litigation we are unpersuaded that an "infringement claim," for purposes of claim preclusion, embraces more than the specific devices before the court in the first suit.

721 F.2d at 1316. Thus *if the plaintiff* claimed that different products infringed the patent in suit, the prior adjudication would not act as a bar to the subsequent claim. The court's conclusion was based on its understanding of the meaning of an adjudication of infringement, noting that "[a]djudication of infringement is a determination that a thing is made, used or sold without authority under the claim(s) of a valid enforceable patent. Thus, the status of an infringer is derived from the status imposed on the thing that is embraced by the asserted patent claims, *the thing adjudged to be infringing.* By the same token, where the alleged in-

fringer prevails, the accused devices have the status of non-infringements, and *the defendant acquires the status of noninfringer to that extent."*

*Id.* (emphasis added). This view is clearly in accord with the basis of the Supreme Court's seminal holding in *Kessler v. Eldred,* 206 U.S. 285, 27 S.Ct. 611, 51 L.Ed. 1065 (1906). In *Kessler,* the manufacturer of the suspect device had previously obtained a judgment of non-infringement in a suit by the patentee, Eldred. The court held in subsequent litigation that a customer of the manufacturer was entitled to an injunction preventing the patentee from claiming that the same devices infringed the patent. The court held that "it is Kessler's right that those customers should, *in respect to those articles before the court in the previous judgment,* be let alone by Eldred, and it is Eldred's duty to let them alone". (emphasis supplied). 206 U.S. at 289, 27 S.Ct. at 613. See, *Molinaro v. American Tel. & Tel. Co.,* 460 F.Supp. 673, 675 (E.D.Pa.1978), *aff'd,* 620 F.2d 288 (3rd Cir.1980). *Also see, V & S Ice Machine Co. v. Eastex Poultry Co.,* 381 F.2d 303 (5th Cir.1967) (prior adjudication of non-infringement bars subsequent claim by assignee of patentee against customer of manufacturer who defended earlier action where prior litigation by patentee concerned the same devices).

The rule articulated by the *Nordson* court limiting an infringement claim in the laches and estoppel context to particular acts of infringement must be read in *para materia* with these principles. Where the patentee's claims of infringement are barred by laches and estoppel, all that is barred is a particular allegation made against a particular device. As the Federal Circuit has noted, an infringement claim for *res judicata* purposes only embraces the "specific devices" before the court in the first suit. *Young Engineers,* 721 F.2d at 1316. A prior judgment of non-infringement, in short, does not give the accused infringer an unlimited license under the patent-in-suit. The rights acquired by the accused infringer are limited to the particular devices found not to in-

fringe the patent. *Id.* There is no reason why the defendant in this action should be afforded the unlimited license under the patent-in-suit denied in an analogous context in *Young Engineers*. This is especially so in a case such as this where the acts of the patentee found to establish laches and estoppel and bar the Rudlaff-based infringement action occurred before the development of the Plumridge design. Thus this court holds, as a matter of law, that the plaintiff may proceed with its infringement action even if it alleges that the same claims of the patent in suit are infringed by both the Rudlaff and Plumridge devices so long as those devices are sufficiently dissimilar. While the determination that a particular device infringes a patent is only made with reference to the claims of the patent, "infringing activity" for purposes of claim preclusion is defined by the devices themselves. At this point then it is not the court's task to construe the claims of the patent in suit and determine the issue of infringement, rather the focus of our inquiry is on the defendant's products for the purpose of comparison.

■ Unfortunately, the relevant precedent does not specify the standard to be applied in examining the similarities and differences between the two devices. *Young Engineers* and *Eastex Poultry* appear to adopt the position that for purposes of the doctrine of *res judicata* the devices previously challenged must be identical to those subsequently alleged to infringe to bar the subsequent claim. Cases in the laches and estoppel context, *Watkins* and *Celotex* most notably, are silent on the point. The Plumridge conveyor is not, strictly speaking, the "specific device" that was the subject of the parties' correspondence found to establish laches and estoppel. *Young Engineers,* 721 F.2d at 1316. Centri–Spray had not developed the Plumridge model by that time. If, however, the devices are functionally equivalent, the plaintiff's infringement claim should be equally barred because the conduct of the defendant has essentially not changed. The plaintiff should not be able to avoid the effect of this court's prior judgment by pointing to superficial distinctions between the Rudlaff and Plumridge devices. Thus, this court holds that the plaintiff's claim that the Plumridge device infringes the patent in suit will only be barred by the estoppel found applicable to the Rudlaff claim if the defendant's subsequent product is the equivalent of the earlier product under the established doctrine of equivalents used to determine infringement.

The leading Supreme Court case on the doctrine of equivalents, *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), defined the concept by noting that

> [i]f two devices do the same work in substantially the same way, and accomplish the same result, they are the same, even though they differ in name, form or shape.

339 U.S. at 608, 70 S.Ct. at 856. Under this rule, Centri–Spray would be free to develop accumulating conveyors which achieve the desired end in the way that the Rudlaff product operates. This would give effect to this court's earlier holding that MGA had through its predecessor's earlier correspondence with Centri–Spray left the defendant with the expectation that its Rudlaff-based business would remain unmolested. If the new product is not functionally equivalent to the Rudlaff device, there is no reason to bar the plaintiff's claim against it because it is essentially a different claim of infringement.

FINDINGS OF FACT

■ At trial the defendant presented one witness, Centri–Spray vice president and general manager Frederick Koepke, an engineer with knowledge of the relevant products. Plaintiff offered no witnesses but produced numerous blueprints and models of the Plumridge and Rudlaff devices as well as the relevant patents and patents of earlier accumulating conveyors. As previously indicated, defendant did not actually present the case that the devices were substantially similar in the way that they are alleged to infringe the plaintiff's '656 patent. Plaintiff, through cross-examination of the witness, developed his main contention: the accumulation control

function was quite different in the two devices developed by the defendant. In order to fully comprehend the issue, it is necessary to understand the basic function and purpose of accumulating conveyors.

Accumulating conveyors play a major role in the 'automation' of manufacturing processes, especially in the automobile industry. Broadly these devices function to move parts from an initial loading point through a series of intermediate "downstream" work stations to a final point where the finished item is removed from the production line. All these devices consist of a stationary frame on which the parts are placed and moved. The parts are moved by mechanisms ("feed dogs") mounted onto a moving slide ("transfer slide"). The transfer slide has a forward "downstream" motion and reverse motion. The prototypes of these devices were simple conveyors. In these earlier devices all feed dogs were engaged and with each successive forward motion ("stroke") of the slide all parts would be moved forward. Accumulation is a process designed to cope with the situation created when a part is removed from one of the intermediate work stations. If the conveyor simply functioned to move each and every part downstream to the next adjacent work station, the "void" created when a part is removed from the line would simply be transferred to each successive work station. This would result in lost work time. Accumulating conveyors are designed to fill these voids by moving only those parts which are upstream from the void. The parts at those work stations downstream from the void are not moved. All accumulating conveyors must possess sensing devices that can determine whether a part is missing from a given work station related to control mechanisms which insure that only those parts upstream from the void are moved. The question posed essentially is whether the control mechanisms of the conveyors are equivalents. It is clear from the foregoing that this part of each device is directed towards the same goal: to insure that the next forward motion of the transfer slide only affects those parts upstream from the empty work station. The

issue comes down to whether they do this work in the same way.

In the Rudlaff design conveyor each intermediate work station is (or can be) equipped with a cam which senses the presence or absence of a part. In particular, a portion of the cam that extends downward toward the next adjacent upstream work station will be raised under the weight of a part. When a part is absent, that portion of the cam is lowered. Accumulation is controlled by the interaction between these cams and a series of segment bars resting on the transfer slide. The segment bars are associated with the transfer slide by means of a linch pin which can latch over a part mounted onto the slide. When a cam is raised, the corresponding linch pin is similarly raised. When a cam is lowered, the linch pin becomes connected to a part mounted onto the transfer slide. Accordingly, the reverse motion of the slide will affect the segment bar associated with that linch pin, and it will be moved upstream. If the cam is raised, however, the linch pin will be raised as well, and the associated segment bar will become disengaged from the motion of the transfer slide. Consider the situation when a void exists. As the transfer slide moves backwards (upstream), the linch pin associated with the segment bar of the occupied work station downstream from the void will be raised as it comes in contact with the raised cam. The associated segment bar will be disengaged from the motion of the transfer slide and will not be affected by it. However, the linch pin associated with the adjacent empty work station will simply pass over the lowered cam that senses the void. The segment bar associated with that linch pin will continue to be engaged to the transfer slide and affected by its motion. It will move upstream. The linch pin associated with the next adjacent upstream work station will, of course, be raised since the associated cam has been raised by the presence of a part of that station. But the segment bar associated with this occupied work station will move nonetheless because it is affected by the motion of the segment bar downstream. Since the bars abut, the

motion of the transfer slide will affect all work stations upstream from the void regardless of whether its linch pin has been raised. Similarly, the feed dogs in the Rudlaff device are related to the segment bars in such a way that if the bars are affected by the motion of the transfer slide the dogs will be moved to an engaged position. On the next forward stroke of the slide it will be noted that only those dogs upstream from the void will be engaged and, accordingly, only those parts upstream from the void will be moved forward. In short, accumulation is controlled by the interaction between a sensing mechanism and segment bars properly brought into end-to-end abutment with the reverse motion of the transfer slide.

In the Plumridge model, the accumulation control function is powered by a source independent of that which operates the transfer slide. It moves in the opposite direction of the transfer slide. Like the Rudlaff conveyor, each intermediate work station can be equipped with a sensor device. In the Plumridge conveyor, the presence of a part serves to move a connecting unit that will effectively link the associated segment bar with the adjacent upstream segment bar. Where no part is present, the connection is not made and the motion of the downstream segment bar will not be transmitted to its upstream neighbor. The independent power source that effectuates accumulation moves only those segment bars that are associated by the link mechanism, i.e., those work stations downstream from the void. The motion of the segment bars functions to lower a cam associated with the feed dogs. This brings the cam into contact with a pin mounted to the feed dog. This motion lowers the feed dog associated with that work station. Accordingly, when the transfer slide makes its next forward stroke, those feed dogs downstream from the void will not be engaged. Parts at those work stations will not move. The feed members at work stations upstream from the void will remain up as the relevant cam has not been affected by the motion of the segment bars downstream because of the void. Parts at those stations will be moved forward with the next

stroke of the transfer slide and accumulation will occur. The subsequent reverse motion of the transfer slide brings the pins mounted to the feed dogs in the lowered position into contact with a part pivotally mounted to a larger piece attached to the stationary frame of the conveyor. This causes the pin to be raised and the feed dog is moved to the engaged position. When the transfer slide is fully returned, the independent power source can again be activated, lowering the requisite feed dogs to effect accumulation with the next forward motion of the transfer slide.

The reverse motion of the transfer slide clearly remains important in the Plumridge design. Since the feed members are biased by gravity, they will be lowered when passing under a part. The reverse motion of the slide, then, permits the dogs to be engaged. But, unlike the Rudlaff device, accumulation is really controlled by a separate, independent source. Further, the functional logic of the segment bars is completely reversed in the Plumridge device. There, it is the segment bars associated with the work stations downstream from the void that are brought into engagement. Work stations upstream from the void are not affected by the motion of the segment bars since the absence of the part does not permit the bars to be connected and the motion to be effectively transferred. In the Rudlaff device, it will be remembered, the interaction between the linch pin and cam functions to disengage those segment bars downstream from the void from the relevant motion (in that case the reverse motion of the transfer slide). Only those segment bars upstream from the void are affected by the motion of the transfer slide.

CONCLUSIONS OF LAW

Based on the record thus far, the court finds that the accumulation control feature of the Rudlaff and Plumridge design accumulating conveyors, that aspect of the device alleged to infringe the patent-in-suit, is not substantially similar. Accordingly, for the limited purpose of determining under a motion for summary judgment whether the defendant may take advantage of the lach-

es established with regard to the Rudlaff based claim, it must be concluded that the nature of the alleged infringing activity has changed. Since the nature of the infringing activity has been altered with the introduction of the Plumridge device, MGA's claim that it infringes the patent-in-suit is not barred by laches and it may proceed accordingly.

IT IS SO ORDERED.