The YOUNG ENGINEERS, INC., (aka Tye or Tye, Inc.,) Appellant,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee.

Appeal No. 83–649.

United States Court of Appeals, Federal Circuit.

Nov. 8, 1983.

Joseph E. Mueth, Los Angeles, Cal., argued for appellant.

Jane K. Albrecht, Washington, D.C., argued for appellee. With her on the brief were Michael H. Stein, General Counsel and Michael P. Mabile, Acting Asst. Gen. Counsel for Litigation, Washington, D.C.

Before NICHOLS,* and NIES, Circuit Judges, and COWEN, Senior Judge.

NIES, Circuit Judge.

This appeal, in a proceeding under 19 U.S.C. § 1337, raises two novel issues: (1) whether following disapproval by the President of the determination in an investigation, the International Trade Commission must institute a new investigation in order to exercise its authority to issue an exclusion and/or cease and desist order based on previously found unfair acts; and (2) whether, under principles of *res judicata,* a dismissal with prejudice of an infringement suit against appellant precludes a holding that appellant infringes complainant's patents. Our jurisdiction of this appeal is under 19 U.S.C. § 1337(c) and 28 U.S.C. § 1295(a)(6). We answer both questions in the negative in this instance, and, finding no merit in any other defense, we affirm the determinations of the Commission. *Certain Molded-In Sandwich Panel Inserts and Method for Their Installation,* Inv. No. 337–TA–99, USITC Pub. No. 1246, 218 USPQ 832 (1982).

I

The subject investigation is the culmination of a patent controversy between Shur-Lok Corporation (Shur-Lok), complainant, and The Young Engineers, Inc., (TYE) appellant, which goes back many years. Shur-Lok is a domestic manufacturer of devices, called sandwich panel inserts, used in aircraft production.[1] Shur-Lok is the owner of three patents associated with the device:

U.S. Patent No. 3,282,015, issued November 1, 1966, covering the device.

U.S. Patent No. 3,271,498, issued September 6, 1965, and U.S. Patent No. 3,392,225, issued July 9, 1968, both covering methods of installing inserts in the sandwich panels.

TYE has been importing sandwich panel inserts from Japan since the mid-60's. After Shur-Lok charged TYE with selling infringing inserts, apparently TYE began importing a modified device. Shur-Lok objected to the latter as well and, in 1969, filed suit in the United States District Court for the Central District of California, Civil Action No. 69–265, charging infringement of the patents which are the basis for the § 1337 investigation.

Specifically, Shur-Lok charged TYE with directly infringing Shur-Lok's U.S. Patent No. 3,282,015 for the insert and with actively inducing others to infringe U.S. Patent Nos. 3,271,498 and 3,392,225. Shur-Lok's complaint prayed for both a permanent injunction against future infringement and damages for past infringement.

TYE answered the complaint alleging that the patents were invalid and not infringed and also asserted these defenses in declaratory judgment counterclaims. Fol-

* Judge Nichols assumed senior status October 1, 1983, following submission of the case.

1. A sandwich panel is a lightweight structure formed by securing a honeycomb core between two skin sheets. Sandwich panels are used in the construction of lavatories, galleys, walls, floors, control surfaces and other parts of aircraft. Sandwich panel *inserts,* the products in issue, are used for anchoring attachments onto the panels. The inserts are inserted into a sandwich panel and anchored into place by a "potting" compound. Each insert has an injection port for insertion of the potting compound, and a venting and an inspection port. A threaded bore provides means for mechanical attachment.

The accused devices which were apparently sold by TYE had either two or three ports. The findings of fact suggest that only three port devices were sold by TYE at the time of the 1969 infringement action, although this fact is disputed by TYE.

Apparently other models of the device, two port devices, were imported by TYE some seven or eight years after the 1972 dismissal. Both two and three port devices were the subject of the Commission investigation.

lowing discovery by way of depositions, document productions, and interrogatories, trial was set to commence in the district court on July 11, 1972. However, on July 6, 1972, Shur-Lok moved to postpone the trial, expressly seeking either to attempt settlement of the suit or "to voluntarily dismiss the action with prejudice."

On July 11, 1972, Shur-Lok filed its "Motion to Dismiss with Prejudice" pursuant to Fed.R.Civ.P. 41(a)(2) which allows dismissal only upon "such terms and conditions as the court deems proper." Shur-Lok represented to the court that the industry had greatly deteriorated during pendency of the suit, that TYE's infringement of the patents did not justify the expense of the trial, and that TYE could expect no more favorable judgment than if the suit were tried, unless the patents were held invalid. TYE objected to dismissal, *inter alia,* seeking recovery of its considerable attorney fees. At the hearing, the court stated in granting the motion:

> Plaintiff in this case cannot bring a suit against this Defendant involving any of the issues of validity of the patent or the claims of the patent here . . . .

> [T]he counterclaim is dismissed without prejudice that the Defendants can at any time, in the event they feel any injury or damage, sue the Plaintiffs again.

The final judgment, entered July 25, 1972, simply dismissed the complaint with prejudice and the counterclaims without prejudice. Thereafter, TYE continued its importation of inserts of various designs without objection from Shur-Lok.

On March 27, 1981, Shur-Lok initiated the present proceedings before the Commission by filing a complaint alleging, *inter alia,* that TYE and five purchasers[2] from TYE were in violation of § 337 of the Tariff Act of 1930 (19 U.S.C. § 1337(a))[3] because of unfair acts, namely, infringement of Shur-Lok's patents, in the importation and sale of the devices. Shur-Lok also charged TYE with misappropriation of trade secrets but this charge was dropped early in the investigation. The Commission instituted Investigation No. 337–TA–99 on April 29, 1981. The complaint and notice of investigation were amended on August 7, 1981, to add as respondents, the Japanese manufacturer of the subject imports, Hariki Metal Industries, and the exporter, Kyoei Trading Corporation of Japan.

In its answer to Shur-Lok's complaint, TYE raised the affirmative defenses of *res judicata,* laches, and estoppel, all in essence based on the prior litigation. Prior to the hearing on the merits, TYE moved for summary determination on the grounds that the investigation was precluded by the *res judicata* effect of the 1972 judgment. The administrative law judge (ALJ) denied the motion, after consideration of the record of the prior litigation, on the grounds that the civil action and the Commission proceeding were separate causes of action and that there was not complete privity between the parties in the civil action and the Commission proceeding. Thereafter, an evidentiary hearing on the merits of the complaint was held before the ALJ. TYE did not appear or participate in that phase of the proceedings. The ALJ found that the asserted patents were valid and infringed and these findings were adopted by the Commission. The Commission also held that the proceeding was not barred by the doctrine of *res judicata* and that TYE waived its defenses of laches and estoppel.

To implement its determination of § 1337 violations, the Commission issued a general

---

**2.** The five domestic purchasers of the subject inserts include C & D Plastics, Hitco Corporation, Composites Unlimited, U.O.P. Aerospace, and Weber Aircraft.

**3.** 19 U.S.C. § 1337(a) reads:
(a) Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provisions of law, as provided in this section.

exclusion order prohibiting the importation of infringing inserts for the remaining life of the '015 patent; a cease and desist order prohibiting TYE from selling imported inserts acquired subsequent to institution of the investigation where such sales would contribute to or induce infringement of the '225 and/or '498 patents; and cease and desist orders to three of TYE's customers Weber Aircraft, Hitco and U.O.P. Aerospace, prohibiting their use of the imported inserts.

Following action in an investigation, the ITC must forward the matter to the President who may disapprove the ITC action for policy reasons. 19 U.S.C. § 1337(g)(2). In this case the President exercised that authority, transmitting his disapproval of the Commission's determination on June 28, 1982. Pertinent portions of the President's notice of disapproval state:

> The effect of the cease and desist orders directing the three purchasers not to use imported products when practicing a process in the United States that infringes a process patent may not be in compliance with U.S. international obligations. The orders may result in less favorable treatment in requirements affecting purchase and use being accorded imported products than treatment being accorded domestic products. The three orders do not stop the infringement of the process patents in the U.S. Because of the statutory limits on USITC jurisdiction, those orders can only act as restrictions on the purchase and use of the imported products.

> My disapproval of the USITC determination in this case in no way circumscribes the USITC authority to issue cease and desist orders. Cease and desist orders are more flexible remedies than exclusion orders and are appropriate in cases where an importer is the wrongdoer. The discriminatory effect upon imported products of the three orders directed to the users of those products forms the basis of my decision to disapprove in this case.

Since the rationale for the President's disapproval was limited to the three cease and desist orders directed to domestic users, on August 3, 1982, the Commission issued a notice proposing "modification" of the determination disapproved by the President. Of particular importance here, the Commission did not reopen the record on the merits or otherwise institute a new investigation. In issuing this notice, the Commission denied the request of the complainant Shur-Lok that the Commission initiate a new investigation. TYE also objected to the procedure, but on the ground that such action was out of time, that is, contrary to the one year statutory period mandated by 19 U.S.C. § 1337(b)(1) for completion of an investigation, and on the ground that the Commission's failure to reopen the investigatory record was contrary to due process and the Administrative Procedure Act.

After the submission of comments by Shur-Lok and TYE, the Commission voted on September 8, 1982, to modify its findings on remedy, the public interest, and bonding to be consistent with the policy considerations underlying the President's disapproval of the original remedy determination. On September 17, 1982, the Commission issued the following orders:

(1) a general exclusion order prohibiting the importation of infringing inserts for the remaining life of U.S. Patent No. 3,282,015; and

(2) a cease and desist order directed to TYE prohibiting it from selling imported inserts acquired subsequent to institution of the investigation where such sales would contribute to or induce infringement of U.S. Patent Nos. 3,271,498 and/or 3,392,225.

The matter was again submitted to the President, no disapproval resulted (although the Commission's procedure was questioned), and the determination thus became final for purposes of appeal.

## II

### Procedure

The initial question raised by this appeal is whether presidential disapproval of the

determination in this investigation terminated the investigation for all purposes.

In *Aktiebolaget Karlstads Mekaniski Werkstad v. USITC.*, 705 F.2d 1565, 1578, 217 USPQ 865, 874–75 (Fed.Cir.1983), (hereinafter *Headboxes* case) this court approved the procedure where, following presidential disapproval, the ITC instituted a second investigation, "salvaged from the first investigation ... the record and the findings and conclusion of the presiding officer [*i.e.,* the administrative law judge]," and set up a procedure whereby evidence concerning new issues could be added to the record.

The shortcut taken here removes an additional step. The ITC did not start a second investigation but treated the investigation as an open and pending matter in connection with which orders could be issued to effectuate a remedy. Moreover, the record on the merits was not reopened although written comments on the "modified" remedy were received.

The problem arose here as in *Headboxes* because the investigation concerned a number of related but distinct acts of unfair competition. It is the practice of the ITC to consider such charges in a single "investigation" and to present a single "determination" and what might be called a "single composite remedy" to the President. Even though the statute is clear that an exclusion order and a cease and desist order are alternative remedies,[4] the Commission has adopted the view that § 1337(f)(1) is not an absolute bar to both kinds of orders in a single investigation when the conclusion is reached that there are various unfair acts.

With respect to the propriety of both types of orders in this case, the Commission ruled:

> Issuance of the orders discussed above does not conflict with the "in lieu of" language of section 337(f) or with the Commission decision in *Doxycycline*[38] because the various orders are directed at *different unfair acts.* The general exclu-

sion order is aimed at infringement of the '015 *product* patent. The cease and desist orders issued against Hitco, Weber Aircraft, and UOP Aerospace are aimed at *direct* infringement of the two method patents. The cease and desist order issued against TYE is directed at *induced* and *contributory* infringement of the method patents. Thus, this case is analogous to the *Stoves I*[39] investigation where the Commission issued both an exclusion order and cease and desist orders, but directed at separate and distinct unfair acts.

[38] Inv. No. 337–TA–3, Doxycycline, USITC Pub. 964 (April 1979). Commissioner Stern does not reach the issue of whether there are different unfair acts. See opinion of Commissioners George M. Moore and Paula Stern, concurring in part and dissenting in part, Doxycycline, p. 22.

[39] Inv. No. 337–TA–69, Certain Airtight Cast-Iron Stoves, USITC Pub. 1126 (Jan. 1981). [Emphasis in original.]

A somewhat similar problem arising from a "partial" termination of an exclusion order was discussed in *SSIH Equipment Co. v. USITC,* 718 F.2d 365, 218 USPQ 678, 683, n. 8 (Fed.Cir.1983), note 8 (*SSIH II*):

> S–W does not assert that an exclusion order could not be terminated in part. Such a position would raise only a formalistic, not substantive, objection. By practice, the Commission issues exclusion orders covering several independent bases for exclusion of goods rather than separate exclusion orders for each. The multiple based approach was taken here in that goods infringing any *one* of the claims were excluded. Thus, in practical effect, the June 19 order may be thought of as separate orders on each claim, only two of which were not terminated on August 10. While the Commission's order of August 10, 1981, was phrased in terms of "suspension" of a portion of the earlier order, its effect was partial termination. We are not bound to consider it anything less because of the words used.

---

**4.** 19 U.S.C. § 1337(f)(1) provides:
*In lieu* of taking action under subsection (d) or (e) [permanent and interim exclusion orders], the Commission may issue ... an or-

der directing such person to cease and desist from engaging in the unfair methods or acts involved. [Emphasis added.]

*Cf. Rohm & Haas Co. v. USITC,* 554 F.2d 462, 463, 193 USPQ 693, 694 (CCPA 1977) (Commission order granting motion to dismiss without prejudice held with prejudice).

As indicated in the presidential disapproval letter here, the President had no alternative but to veto the determination although he disapproved only part of the remedy. Had each violation been set forth separately with its appendant remedy, and sent to the President as separate determinations, the President would have been in a position to disapprove only the determination connected with the cease and desist orders which he found unacceptable. Thus, on the facts of this case as in *SSIH II,* we believe that it would be formalistic to upset the action taken by the Commission unless the statute leaves no alternative.

With respect to the statutory effect of presidential disapproval, the principal dispute between the parties is over the interpretation of § 1337(g)(2) which reads:

(2) If, before the close of the 60-day period beginning on the day after the day on which he receives a copy of such determination, the President, for policy reasons, disapproves such determination and notifies the Commission of his disapproval, then, effective on the date of such notice, such determination and the action taken under subsection (d), (e), or (f) of this section with respect thereto shall have *no force or effect.* [Emphasis added.]

In TYE's view "no force or effect" means null and void. The Commission argues that since the President can disapprove only for policy reasons, the determination, including the orders, remains valid but ineffective. TYE counters that, even if that view were accepted, the ITC in this case did not meet the statutory time limitation of one year to complete an investigation inasmuch as the orders issued more than a year after the investigation began. The ITC answers that it has authority under 19 U.S.C. § 1337(h) and 5 CFR § 211.57 to change its orders after the twelve month period. For conve-

nience we will dispose of the last two arguments first.

A

Contrary to the ITC's view, we see no authority in § 1337(h) to support the action by the Commission here.

Section 1337(h) reads:

*Period of Effectiveness*

(h) Except as provided in subsections (f) and (g) of this section, any exclusion from entry or order under this section shall continue in effect until the Commission finds, and in the case of exclusion from entry notifies the Secretary of the Treasury, that the conditions which led to such exclusion from entry or order no longer exist.

5 CFR § 211.57, which implements this provision, in relevant part reads:

(a) Whenever any person believes that changed conditions of fact or law, or the public interest, require that *a final Commission action* be modified or set aside, in whole or in part, such person may file with the Commission a motion requesting such relief. *The Commission may also on its own initiative consider such action.* [Emphasis added.]

The Commission reasoned that a determination is "final" on conclusion of an investigation, that is, before action by the President. A precedential interpretation on this point was made in *SSIH II,* 718 F.2d at 369, 218 USPQ at 683, in which this court held that the statute provides that an ITC determination (including remedy) becomes *effective* upon publication in the Federal Register, that is, prior to submission to the President, but is not *final* until presidential approval is given or the 60-day period for review expires without disapproval. As stated therein:

S–W confuses the "effectiveness" of a determination with its "finality." While Commission determinations are not *final* for purposes of appeal to this court until the review period has run, they are otherwise "effective upon publication * * * in the Federal Register," Section 337(g)(2).

During the Presidential review period, products are in fact excluded from entry except under bond.

Thus, Commission orders are "effective" before they are "final," not "final" and then "effective."

Reliance on the authority of § 1337(h) to "modify" an order which is no longer in effect after presidential disapproval is, thus, misplaced. It seems beyond argument that § .1337(h) relates to an order in effect and how long it will "continue in effect." Moreover, this section explicitly recognizes that an order is no longer in effect at an earlier date if disapproved by the President under § 1337(g). Thus, the exclusion order and cease and desist orders having been rendered of no effect under § 1337(g), there simply was no order thereafter to "continue in effect." What the Commission actually did was *to issue* new orders. No authority can be found in § 1337(h) to issue exclusion orders but only to end the effectiveness of an outstanding order where "the conditions which led to such exclusion from entry or order no longer exist." 5 CFR § 211.57 cannot, and does not, provide greater authority than the statute. Moreover, § 211.57 itself speaks of "final Commission action"—a condition that the original orders never achieved. Thus, to this extent, the Commission's analysis must be rejected.

**B**

██ On the other hand, we also reject TYE's argument that the subject orders are *ultra vires* because untimely under § 1337(b). This section provides, in pertinent part:

1337(b)(1) The Commission shall investigate any alleged violation of this section on complaint under oath or upon its initiative. Upon commencing any such investigation, the Commission shall publish notice thereof in the Federal Register.

The Commission shall conclude any such investigation, and make its determination under this section, at the earliest practicable time, but not later than one year (18 months in more complicated cases) after the date of publication of notice of such investigation.

If the "determination" which the Commission must "make" within the year includes the issuance of its remedy orders, TYE's position would be correct. However, the legislative history of the Trade Reform Act of 1974 suggests that "determination" in § 1337(b) means only the conclusion that there is a violation or no violation of § 1337(a).[5] The word "determination" appears in other paragraphs of § 1337, but its meaning is confused rather than clarified by comparison of the various clauses in which it appears. In subsections (d) and (e) (providing authority to issue exclusion orders) "determination" again appears to encompass only the holding of violation under subsection (a), whereas in subsection (c), remedy is referred to as a "finding" but, anomalously, the paragraph also refers to "a determination" under (d), (e), or (f). Subparagraph (f) clearly relates only to remedy, i.e., issuance of a cease and desist order in lieu of an exclusion order under (d) or (e). Thus, remedy could itself be considered a separate "determination."

Provided with no clear meaning of "determination" in the statute, we defer to the Commission's interpretation that § 1337(b)(1) time limitations are satisfied if the Commission completes its investigation, makes a determination of "violation," and issues an initial remedy order within the prescribed time period (19 CFR § 210.15).

In reaching this conclusion, we have taken into consideration TYE's argument that the time limitations are designed to provide a time frame for the unfair acts. We do not agree with this premise. Since the time

5. Sen.Rep. No. 1298, 93rd Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, pp. 7186, 7327:

Section 337(b)(1) of the Act, as amended by the bill, ... would provide that upon commencing an investigation under section

337, the Commission would publish notice thereof, and conclude such investigation and determine whether section 337 is being violated within one year from the date of publication, or in more complicated cases, within 18 months.

period is coupled with a direction to complete an investigation as soon as possible, it seems clear that its purpose is to insure speedy relief.

## C

██ Returning to the initially posed issue of the meaning of "no force and effect" in § 1337(g)(2), we again agree with the Commission that the validity of its determination of violation is unaffected by presidential disapproval. The President may disapprove only "for policy reasons," not because of the merits of an investigation.

As indicated above, the determination and initial remedy are effective immediately. Goods are excluded unless and until disapproval by the President. Thus, "no force or effect" can be given a meaning less forceful than "null and void" and have substantial purpose in the statute. After disapproval, the determination of violation, which by § 1337(b) mandates exclusion of goods, becomes ineffectual. That determination, however, does not thereby become void.

██ Thus, we see no basic impediment in the statute to treating the proceeding as pending and allowing a new remedy order to be issued on the basis of the determination of violation previously made. Requiring a second investigation would place a merely formalistic barrier in the way of expeditious relief.

Also, we see no circumstance here which indicates any basic unfairness in the Commission's procedures. The new orders were promptly issued after presidential disapproval; no more was done than eliminate some of the previous cease and desist orders; and no new issues requiring a hearing were asserted by any person who would be adversely affected. While TYE did assert that a hearing should have been held by reason of the "evaporation" of Shur-Lok's case, this assertion is premised on the erroneous view that a violation can only be predicated on conditions during the one year preceding issuance of an exclusion order, a view we reject. *Bally/Midway Manufacturing Co., v. USITC*, 714 F.2d 1117,

219 USPQ 97, 100 (Fed.Cir.1983). Thus, we find no violation of the statute or due process in the procedure followed.

## III

### *Res Judicata*

This appeal raises another issue of first impression, specifically, what effect, under principles of *res judicata*, a final judgment of a federal district court in prior patent infringement litigation should be given in a subsequent § 1337 proceeding.

In this case the "unfair methods of competition and unfair acts" found to be prohibited by 19 U.S.C. § 1337(a) are predicated on patent infringement. While three patents are involved, for analysis we need only consider the '015 patent which consists of one claim directed to the product, i.e., the insert itself. This patent was held by the Commission to be infringed by the inserts imported by TYE, and the acts of TYE, thus, were found to be proscribed by § 1337(a). As indicated, the same patent was asserted by Shur-Lok against TYE in the district court litigation which ended by a dismissal with prejudice prior to trial. On the basis of the final judgment in its favor in that case, TYE asserts that Shur-Lok is wholly barred from relief in this proceeding.

The Commission found that the § 1337 investigation was not the same "cause of action" as the court case, stating that "the acts complained of here all happened *subsequent* to dismissal of the court case, and are apparently occurring on a larger scale" and because "TYE has introduced 8 new models of imported inserts within the last 18 months." The Commission then found the facts here comparable to those in *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), where a second antitrust suit was held to be not barred because the acts complained of in the second suit were all subsequent to the first, the acts were "new" violations of a different nature and the defendant's monopoly had substantially increased. The Commission did not rely on the additional

factors that the proceeding was based on a different statute giving rise to a remedy not available in the civil suit and involved the Government as a party, although these points are made in the Government's brief on appeal.

### A

As an initial matter we note some confusion in the arguments of the parties in use of the terms "*res judicata*," "collateral estoppel," "cause of action," and "claim" and "issue" preclusion. In our analysis we will be guided by the *Restatement (Second) of Judgments* (1982) which, in introductory note to § 13, provides the following basic statement:

> The principal concepts developed in this Chapter are: merger—the extinguishment of a claim in a judgment for plaintiff (§ 18); bar—the extinguishment of a claim in a judgment for defendant (§ 19); and issue preclusion—the effect of the determination of an issue in another action between the parties on the same claim (direct estoppel) or a different claim (collateral estoppel) (§ 27). The term "res judicata" is here used in a broad sense as including all three of these concepts. When it is stated that "the rules of res judicata are applicable," it is meant that the rules as to the effect of a judgment as a merger or a bar or as a collateral or direct estoppel are applicable.

 The parties do not dispute that principles of "claim" preclusion, not "issue" preclusion, apply in this case.[6] A critical difference between these concepts is that issue preclusion operates only as to issues actually litigated, whereas claim preclusion may operate between the parties simply by virtue of the final judgment. Thus, principles of merger and bar may apply even though a judgment results by default, con-

sent, or dismissal with prejudice although care must be taken to insure the fairness in doing so. 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §§ 4419, 4442, 4443 (1981).

In this case, no issues were actually litigated in the prior suit. Thus, no "issue" can be said to have been determined or precluded. Therefore, if *res judicata* applies, it can only rest on principles of claim preclusion, that is, that the prior judgment *bars* the same "claim."

The concept of a "claim" is described in § 24 of the *Restatement* as follows:

> § 24. Dimensions of "Claim" for Purposes of Merger or Bar—General Rule Concerning "Splitting"
>
> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2) What factual grouping constitutes a "transaction", and what grouping constitutes a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Claim preclusion, where found, operates to bar subsequent assertion of the same transactional facts in the form of a different cause of action or theory of relief. Generally, this principle rests on the assumption that all forms of relief could have been requested in the first action. Again, the *Restatement* counsels:

---

**6.** It should be noted that the quotation from the *Restatement* speaks in terms of *claims* and does not make reference to "causes of action." In some instances, a "cause of action" may be the equivalent of a "claim," but generally, reference to a "cause of action" in this connection leads to consideration of what have come to be

regarded as irrelevant matters. *See Alyeska Pipeline Service Co. v. United States*, 688 F.2d 765, 769–71 (Ct.Cl.1982) and *Container Transport International Inc. v. United States*, 468 F.2d 926, 928–29 (Ct.Cl.1972), which follow the *Restatement* terminology and analysis.

*§ 26(c). Where formal barriers existed against full presentation of claim in first action (Subsection (1)(c)).* The general rule of § 24 is largely predicated on the assumption that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first.

The formal barriers referred to may stem from limitations on the competency of the system of courts in which the first action was instituted, or from the persistence in the system of courts of older modes of procedure. . . .

■ In this case, it is indisputable that the relief available in a § 1337 proceeding by way of total exclusion of foreign·infringing merchandise was not available in the district court. Thus, it could be argued that no claim preclusion can ever apply in a § 1337 proceeding as a result of a judgment in a prior civil litigation. However, the evils of vexacious litigation and waste of resources are no less serious because the second proceeding is before an administrative tribunal. Moreover, the *Restatement* conclusions are directed to cases involving a second proceeding before another court, not before an administrative tribunal. Some adaptation of claim preclusion appears desirable, indeed necessary, in its application to administrative proceedings, but little guidance can be found in any authorities in such situations. The Commission itself did not rely simply on the unavailability of the § 1337 remedy in the court proceeding as, *ipso facto,* resolving the issue of preclusion, but rather took a more pragmatic approach with which we are generally in agreement.

■ In patent-based § 1337 proceedings, a pragmatic approach seems particularly appropriate. If a patent owner has unsuccessfully attacked an alleged infringer for the same infringing acts in a prior court proceeding, no substantive argument has been advanced as to why the patent owner should be given an opportunity to put forth the same charge of infringement again. The alleged infringer is as burdened by the litigation before the Commission as before a court. Moreover, if a second court proceeding would be precluded, there seems no reason that the Commission must devote time and attention to that matter. That "phase" of his claim is not one "which he was disabled from presenting in the first" action. (*Restatement, supra.*)

As stated in *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981):

This Court has long recognized that "[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Baldwin v. Traveling Men's Ass'n.,* 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931).

It is correct that a § 1337 proceeding is not purely private litigation "between the parties" but rather is an "investigation" by the Government into unfair methods of competition or unfair acts in the importation of articles into the United States. Significantly, however, any determination of unfair acts is dependent upon the private rights between parties in the position of complainant and respondent. The 1975 amendment of the statute which added the provision in § 1337(c), "All legal and equitable defenses may be presented in all cases" was a major change which reflects a recognition that essentially private rights are being enforced in the proceeding. Were we to adopt the view that there is no bar to the reassertion of the same factual basis for relief simply because the Government is a party or the relief was not available in the first proceeding, we would effectively negate a significant defense which otherwise could be determinative of private rights.

Moreover, if a complainant's infringement claim has been judicially settled and there is a legal right in the respondent to do the act claimed to be infringing, there would be no legitimate basis for the Commission's finding that such acts are "unfair." The additional requirements for relief in a § 1337 proceeding, e.g., that the patent must be the basis for a domestic industry, narrow the class of patent owners entitled to its benefits. Such requirements do not express an overriding independent governmental interest which insulates the Government from private defenses between parties, but rather these provisions restrict the instances in which relief can be granted.

■ Thus, we conclude that where the "infringement claim" which is the basis for the § 1337 investigation is a claim which would be barred by a prior judgment if asserted in a second infringement suit, that infringement claim may also be barred in a § 1337 proceeding.

### B

The second and determinative issue here is whether the same infringement claim is being relitigated.

TYE argues that it has engaged in a continuing course of conduct which is the same—or substantially the same—as that attacked in the civil litigation. Moreover, the 1969 complaint sought all-encompassing relief against any and all acts of future infringement of the '015 patent. Thus, it is TYE's position that the dismissal with prejudice precludes any litigation against TYE based on the '015 patent. In effect, TYE would have us consider TYE to be a licensee. As such, no finding of unfair acts could be predicated on its importation of inserts which infringe the '015 patent, whether the products are the same or different from those involved in the suit. In this connection, we note that TYE did not seek to prove that the presently imported inserts are the same as those at issue in the civil action. Nor does TYE assert that the

'015 patent was invalidated as a result of the suit. Rather, its defense rests purely on the theory that every charge of infringement against TYE based on the '015 patent is precluded.

■ Even under the broad view that a claim may embrace continuing conduct subsequent to the judgment, we find no authority that claim preclusion would apply to conduct of a different nature from that involved in the prior litigation. *Lawlor v. National Screen Service Corp., supra,* is clearly to the contrary.

■ With respect to patent litigation, we are unpersuaded that an "infringement claim," for purposes of claim preclusion, embraces more than the specific devices before the court in the first suit. Adjudication of infringement is a determination that a thing is made, used or sold without authority under the claim(s)[7] of a valid enforceable patent. Thus, the status of an infringer is derived from the status imposed on the thing that is embraced by the asserted patent claims, the thing adjudged to be infringing. By the same token, where the alleged infringer prevails, the accused devices have the status of noninfringements, and the defendant acquires the status of a noninfringer to that extent.[8] We reject TYE's theory that under principles of *res judicata* it became an unfettered licensee.

■ As the proponent of the defense of claim preclusion, the burden was on TYE to establish the defense by showing that the devices here were the same as those in the 1969 suit. TYE made no attempt to do so, resting its case on the legal theory that any charge of infringement based on the patent is barred, a clearly untenable position. Moreover, the Commission found that at least some of the devices before it were "new" models. The latter fact makes the case similar to *Lawlor v. National Screen Service Corp., supra,* where the purportedly similar series of acts were found to be in part different in nature. Moreover, that Shur-Lok might have obtained an injunc-

---

**7.** It is unfortunately necessary to use the word "claim" here in a different sense.

**8.** *See Molinaro v. AT & T,* 460 F.Supp. 673 (E.D.Pa.1978), *aff'd* 620 F.2d 288 (3rd Cir.1980).

tion against TYE which would have prevented the sale of new models (as well as those actually in suit) does not change our view on this matter. As held in *Lawlor v. National Screen Service Corp.,* 349 U.S. at 328, 75 S.Ct. at 869:

> This conclusion [of no claim preclusion] is unaffected by the circumstance that the 1942 complaint sought, in addition to treble damages, injunction relief which, if granted, would have prevented the illegal acts now complained of.

Thus, *res judicata* in the sense of claim preclusion has not been established. On the above basis, we affirm the decision of the Commission.

### IV

#### *Laches and Estoppel*

We would add that the defense of *estoppel* by the conduct of Shur-Lok is not foreclosed by the above analysis of *res judicata.* However, such estoppel does not arise simply because of the judgment, or because of laches, that is, delay in attacking TYE's subsequent activities.

Estoppel to assert the patent would require (1) an unreasonable and inexcusable delay, (2) prejudice to the defendant, (3) affirmative conduct by the patentee inducing the belief that it had abandoned its claims against the alleged infringer, and (4) detrimental reliance by the infringer. *A.C. Aukerman Co. v. Miller Formless Co.,* 693 F.2d 697, 701, 216 USPQ 862, 866 (7th Cir. 1982). TYE failed to submit any evidence to satisfy these requirements—in particular, it wholly failed to show any detrimental reliance or any equities which would make it manifestly unfair to issue the exclusion order or the cease and desist order, both of which operate prospectively only. Indeed, TYE asserts that it is no longer importing the inserts.

Accordingly, the determinations of the United States International Trade Commission are *affirmed.*

AFFIRMED.