CLEVENGER, Circuit Judge.
Appellant F. Lee Bailey (“Bailey”) seeks review of a final decision of the Court of Federal Claims denying his claim against the United States for breach of contract. Bailey v. United States, 54 Fed.Cl. 459 (2002). Because the Court of Federal Claims did not clearly err in concluding that there was no meeting of the minds on the critical provision-that any stock appreciation would accrue to Bailey-we affirm.
I
This case arises from Bailey’s representation of a client who was facing illegal drug trafficking and money laundering charges in the United States District Court for the Northern District of Florida. In a pretrial meeting, the government indicated that it intended to effect a forfeiture of all of the client’s assets on a theory that they were drug-related assets. In light of the government’s intention, a subsequent meeting including Bailey and government attorneys addressed the source of legal fees for Bailey and his two colleagues. In that meeting, government attorneys agreed that fees in the amount of $1 million per defense attorney would not be unreasonable, and may be justified in view of the complexities of the case. The government also agreed that it would not seek the forfeiture of the client’s drug-related assets to the extent the district court permitted defense counsel reasonable legal fees and the assets comprised the source of the fees.
Bailey advised his client that “the government’s case was substantial and could result in a life sentence.” Joint Stipulation of Facts U 8. The client agreed to “cooperate with the government and disclose his illegal activities, assets and holdings.” Id. Of particular relevance here are two estates in France that required maintenance before being sold, $3.5 million in cash, and 602,000 shares of Biochem Pharma stock estimated to be worth approximately $6 million. Bailey offered to assist the government in the maintenance, liquidation, and repatriation of these assets. The government accepted the offer.
The government initially intended to sell the stock, proposing that the $3.5 million in cash be transferred to Bailey to cover the maintenance, liquidation, and repatriation of the overseas drug-related property as well as attorney’s fees. The client noted that the sale of such a large block was likely to depress share value. Depreciation conflicted with the client’s desire to demonstrate cooperation with the government by maximizing his forfeiture. The client also expressed a belief that the stock might appreciate, potentially increasing his forfeiture. Accordingly, the government suggested that instead of the cash Bailey use the stock to cover the maintenance, liquidation, repatriation, and fees. The *830 suggestion was adopted and the stock was transferred to Bailey’s Swiss bank account.
Bailey used the stock to secure a line of credit and performed many hours of work with respect to repatriation of the assets. Eventually, however, the client terminated Bailey’s services. By this point, the value of the remaining stock had appreciated from $6 million to approximately $15.5 million. Given the change in counsel and the stock’s appreciation, the government lawyers decided to sell the stock and effect the forfeiture of the proceeds. They contacted Bailey seeking the shares. Bailey refused to assist them, taking the position that he was entitled to the appreciation because he took the downside risk.
The government moved to have the stock surrendered, and the District Court for the Northern District of Florida ordered Bailey to bring the stock to court and answer the motion. Bailey did not comply. The client, however, stipulated to the forfeiture of the stock and the district court entered a Stipulated Order of Forfeiture subject to third party claims brought under 21 U.S.C. § 853(n). Bailey surrendered the stock, which was liquidated by the United States. The Final Order of Forfeiture indicates that Bailey claimed an interest, under section 853(n)(2), in “certain stocks, and/or the proceeds thereof,” but that he voluntarily dismissed his claim with prejudice.
Bailey next brought a breach of contract claim in the Court of Federal Claims based on the Tucker Act, which gives the Court of Federal Claims “jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States.” 28 U.S.C. § 1491(a)(1) (2000). He contended that he had an implied-in-fact contract with the United States that, inter alia, made him accountable for approximately $6 million worth of stock in exchange for any appreciation in the value of the stock.
In response, the government argued that Bailey’s claim was barred by the doctrine of res judicata because it involved the same set of transactional facts as his district court section 853(n) claim that was dismissed on the merits by reason of Bailey’s voluntary dismissal with prejudice. The government also argued that Bailey did not have an implied-in-fact contract with the United States because his client’s plea agreement was an express agreement that covered the same subject matter and therefore precluded the existence of an implied-in-fact contract between Bailey and the United States.
The Court of Federal Claims rejected the government’s res judicata argument. It also rejected the government’s argument that the plea agreement between Bailey’s client and the United States precluded the existence of an implied-in-fact contract between Bailey and the United States. However, after careful consideration of the facts, the Court of Federal Claims concluded that there was no meeting of the minds between Bailey and the government on the critical term-that any appreciation in the value of the Biochem Pharma stock was to accrue to Bailey.
Bailey appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3) (2000).
II
The government renews its contention that Bailey’s breach of contract claim is barred by the doctrine of res judicata. We agree with the Court of Federal Claims that the doctrine should not apply to bar Bailey’s breach of contract claim.
Whether a claim is barred by the doctrine of res judicata is a question of law that we review de novo. Faust v. United States, 101 F.3d 675, 677 (Fed.Cir.1996). *831 As a preliminary matter, the term res judicata has been used to encompass what are generally viewed as the distinct concepts of “claim preclusion” and “issue preclusion.” See, e.g., 20 Charles Alan Wright & Mary Kay Kane, Federal Practice and Procedure: Federal Practice Deskbook § 107, at 978 (2002). We have characterized the distinction thus:
A critical difference between these concepts is that issue preclusion operates only as to issues actually litigated, whereas claim preclusion may operate between the parties simply by virtue of the final judgment. Thus, principles of merger and bar may apply even though a judgment results by default, consent, or dismissal with prejudice although care must be taken to insure the fairness in doing so.
Young Eng’rs, Inc. v. United States Int’l Trade Comm’n, 721 F.2d 1305, 1314 (Fed. Cir.1983) (citation omitted). For the purpose of clarity we refer to claim preclusion and issue preclusion separately. We understand the government to argue that Bailey’s claim is barred under either theory.
The doctrine of claim preclusion does not bar Bailey’s breach of contract claim because on this record we are not convinced that Bailey could have brought and fully litigated that claim in district court.
In the past, this court has followed the Restatement (Second) of Judgments when addressing issues of claim preclusion. See Young Eng’rs, 721 F.2d at 1314-15. Accordingly, we have held that the general rule of claim preclusion is that a final judgment extinguishing the plaintiffs claim extinguishes “all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.” Id. at 1314 (quoting Restatement (Second) of Judgments § 24 (1982)). This general rule is subject to the exception that:
[T]he jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant’s presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against a plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim which he was disabled from presenting in the first.
Id. at 1315 (quoting Restatement (Second) of Judgments § 26).
There seems to be no dispute that Bailey’s breach of contract claim arises from the same set of transactional facts that supported his third party claim to an interest in his Ghent’s assets under 21 U.S.C. § 853(n). Thus, the government argues that Bailey’s breach of contract claim became precluded when he dismissed the section 853(n) action with prejudice. Implicit in the argument is that no “formal barriers in fact existed and were operative against” Bailey’s breach of contract claim when he made the third party claim under section 853(n).
There was a formal barrier to Bailey’s claim of breach of contract and demand for relief. The district courts have original and concurrent jurisdiction with the Court of Federal Claims for any “civil action or claim against the United States, not exceeding $10,000 in amount, founded ... upon any express or implied contract with the United States.” 28 U.S.C. § 1346 (2000). Jurisdiction for contract claims greater than that amount lies in the Court of Federal Claims. See 28 U.S.C. *832 § 1491(a)(1). Accordingly, the district court could not have awarded Bailey the approximately $14 million in damages that he sought to recover from the United States.
In addition, to the extent section 853 does not allow Bailey to either keep the stock or recover damages from the United States for forfeiting the stock, it may also be a bar to Bailey’s breach of contract claim. As noted above, section 853 pertains to claims of third party interests in property subject to criminal forfeiture. Subsection (c), titled “Third party transfers,” states:
All right, title, and interest in property [subject to forfeiture] vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.
21 U.S.C. § 853(c) (2000). Section 853(n)(6) allows the court to amend an order of forfeiture where:
(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture ... or, (B) the petitioner is a bona fide purchaser for value ... and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture....
Id. § 863(n)(6) (2000).
Thus, on these facts “[a]ll right, title, and interest” in Bailey’s client’s drug-related assets “vest[ed] in the United States” before they were transferred to Bailey. He knew or should have known that the property was subject to forfeiture. The government notified Bailey of its intent to forfeit all of his client’s assets and Bailey was the attorney who advised the disclosure of the drug-related assets. Bailey was also involved in asking the government to delay the forfeiture of certain assets so that he could make a claim for fees.
Because section 853 authorizes the government to forfeit the stock and limits how a third party transferee can defeat forfeiture-and does not appear to permit a contract claim with the government as a mechanism to defeat forfeiture-it operates as a barrier to a theory of recovery based on a contract with the government. We note, moreover, that the district court entered its Stipulated Order of Forfeiture on the premise that the stock had never belonged to Bailey, but had belonged to the United States since the client had purchased it. We also note that the district court held that Bailey had no standing to challenge the forfeiture other than under section 853(n) or S53(i)(l) (authorizing the Attorney General to grant petitions to distribute forfeited property in the interests of justice). Finally, we note that the government both verbally and in writing told the district court that the court to properly entertain Bailey’s claim was the Court of Federal Claims.
B
The government’s issue preclusion argument labels the issue adjudicated by *833 the district court an issue of ownership of the stock, equating that to the contract claim brought in the Court of Federal Claims. We disagree that the issues are the same. Whether the government can, under section 853, effect the forfeiture of stock that was transferred to Bailey by his client is not the same issue as whether the government had an independent contract with Bailey.
Furthermore, we are not convinced that the contract issue was fully litigated at the district court. Generally stated, issue preclusion may operate where the following elements are met:
(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) plaintiff had a full and fair opportunity to litigate the issue in the first action.
Masco Corp. v. United States, 303 F.3d 1316, 1329 (Fed.Cir.2002). After reviewing the record, we do not find evidence that a contract issue was actually litigated. Even had the issue been addressed, it would not likely have been essential to the final judgment in that action because an assertion that a third party transferee, who has knowingly received assets subject to forfeiture, has a contract with the government granting an interest in the assets is not recognized as a mechanism for relief under section 853(n).
C
In summary, we are unconvinced that the doctrine of res judicata should operate in this case to bar Bailey’s claim. Accordingly we hold that the Court of Federal Claims did not err when it decided to address Bailey’s claim for breach of contract.
Ill
Bailey asserts that he has an implied-in-fact contract with the government that includes a provision that any appreciation in the value of the Biochem Pharma stock accrues to him. His basic argument is that the conduct of the parties in light of the surrounding circumstances shows there was a contract and all that remains is the proper interpretation of the provisions of the contract. That question, he asserts, is a matter of “interpretation of the meaning of the discussions between Bailey and [Assistant United States Attorney] Miller concerning Bailey’s receipt of the stock and rights and obligations relating to the stock.” Appellant’s Br. at 25. According to Bailey, those discussions reflect that Bailey was taking a “risk” or “gamble” by taking the $6 million in stock instead of the $3.5 million in cash. As such, he argues, the discussions show that he was encumbered with the downside risk, which if true must mean the parties agreed that he would receive any upside benefit. The government makes several arguments that can be broadly categorized as two: (1) The determination of the Court of Federal Claims that there was no meeting of the minds on the critical provision of appreciation is entitled to substantial deference; and (2) no contract was formed between Bailey and the United States.
We need not address whether a contract was formed between Bailey and the United States because we hold that even if a contract was formed, it did not contain a provision that any appreciation in the value of the Biochem Pharma stock was to accrue to Bailey. An implied-in-fact contract is “founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.” Balt. & Ohio R.R. *834 Co. v. United States, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923). Whether a meeting of the minds occurred regarding a provision of an im~ plied-in-fact contract is a factual question. See Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1059-60 (Fed.Cir.2001). We review the factual findings of the Court of Federal Claims for clear error. Id. at 1058. “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
As noted above, Bailey’s argument on appeal is that the Court of Federal Claims erred when it found that no agreement was formed containing a provision that promised him the appreciation of the Bio-chem Pharma stock. According to Bailey, such an agreement must have been formed because he had accepted the risk of the depreciation of the stock. Bailey recalled his discussion with government attorneys concerning the stock as follows:
Q: And what did Mr. Miller say to you?
A: [Mr. Bailey] He said, “I want to make it very plain to you, that as these forfeitures take place, the money goes to the U.S. Marshall [sic] for distribution to various points. And you don’t have to accept the stock, you can have the cash, but if you choose to accept the stock, which might help the Government, if it goes south there’s nothing to pay you with. You run the risk of loss. You’ll be taking a gamble,” he said, “if you want to do that, that’s fine. I just want to warn you we don’t have another pot to reach into to help you out.”
Q: What did you say to that statement by Mr. Miller as to what you wanted to do?
A: I agreed to accept the stock in the hope that I could see [sic] it off fast enough so I would come out with at least three and a half million.
Bailey, 54 Fed.Cl. at 464-65. Assistant United States Attorney Miller testified to a similar recollection of the meeting. He acknowledged that he characterized Bailey’s strategy-to use whatever remained after property maintenance and liquidation costs as a source of fees-as a “gamble.” He testified:
Well, as to what I was saying, there were two possibilities on the table. That it was something the defense needed to consider because they were gambling by holding onto this stock. The money could go up in value or the money could go down in value. It’s not necessarily that [the client] is going to get greater credit if the stocks didn’t go up as he anticipated. Very easily they could have gone done [sic].
Id. at 465 (footnote omitted).
In contrast to Bailey’s assertion, the trial court did not ignore this undisputed testimony. See id. at 495-500. The “gamble” reflected by this testimony does not show, either alone or in combination with other evidence, that the parties had a meeting of the minds on Bailey’s critical provision. Rather, Bailey’s argument is fundamentally flawed: even assuming a contract existed under which Bailey assumed some risk of depreciation, the fact that Bailey assumed such a risk does not mean that the parties agreed that he was entitled to any appreciation that might occur. Stated differently, just because the parties agreed that Bailey might lose mon *835 ey if the share price declined does not require that the parties agreed that he would gain extra profit if the share price increased. This is particularly apparent in this case where the surrounding facts do not show that the government ever agreed not to effect a forfeiture of the shares; where on Bailey’s advice, the client would have benefited under an agreement where the appreciation was forfeited; and where Bailey and colleagues were concerned about trying to collect fees from client funds that were designated for forfeiture.
Although Bailey’s brief does not explain why an agreement between the parties placing some of the risk of depreciation on him implies an agreement that he assumed the benefit of any extra profit, at argument Bailey’s counsel suggested that no reasonable person would enter into such a bad bargain. As noted above, we question whether this arrangement was nearly as bad a bargain as Bailey suggests. But bad bargain or not we are bound to accept the finding by the trial court that no meeting of the minds occurred regarding stock appreciation, so long as that finding is not clearly erroneous. Bailey’s theory of clear error is that no reasonable person would accept the downside of holding the stock without contractual assurance of benefit from the upside. One could as easily assert that no reasonable person exposed to the downside would rely on a future claim to an implied-in-fact contract for upside benefit when a simple, actual contract to that effect could have been sought. We see no clear error in the trial court’s decision.
IV
In conclusion, we have carefully reviewed the record and Bailey’s remaining arguments and decide that they do not establish that the Court of Federal Claims clearly erred when it found no meeting of the minds on Bailey’s critical provision. Accordingly, we affirm the judgment of the Court of Federal Claims.